2011 UT 68

**Ron PATTERSON, Plaintiff and Appellee,**

v.

**Randy D. PATTERSON; Estate of Darlene Patterson; Judy Ann Henry; Randy D. Patterson; Gary E. Patterson; Rex A. Patterson; Vicky D. Romero; Ricky D. Patterson; and/or John Does 1–10, and Jane Does 1–10, Defendants and Appellant.**

**No. 20100011.**

Supreme Court of Utah.

Nov. 1, 2011.

L. Miles LeBaron, Tyler J. Jensen, Jacob D. Briggs, Layton, for appellee.

James C. Jenkins, Jeffery B. Adair, Jeremy S. Raymond, Logan, for appellant.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 Shortly before she passed away in 2006, Darlene Patterson (Darlene) executed an amendment (the Amendment) to the Darlene Patterson Family Protection Trust (the Trust). The purpose of the Amendment was to remove Darlene's son Ronald Patterson (Ron) as a beneficiary. On summary judgment, the district court invalidated the Amendment based on its interpretation of our opinion in *Banks v. Means*, 2002 UT 65, 52 P.3d 1190. The trustee, Randy Patterson (Randy), appeals. We reverse the district court's grant of summary judgment and hold that the Amendment is valid under a provision of the Utah Uniform Trust Code (the UUTC), Utah Code section 75–7–605, which has statutorily overruled our holding in *Banks*.

---

1. After creating the Trust, but before making the Amendment at issue here, Darlene executed another amendment and a restatement of the Trust. The validity of these instruments is not at issue in this case. Therefore, we refer to the original trust instrument, the first amendment, and the restatement collectively as the "Trust."

## BACKGROUND

¶ 2 Darlene Patterson created the Darlene Patterson Family Protection Trust in 1999.[1] The Trust property was to be used for Darlene's benefit during her lifetime. Upon her death, Darlene's children were to each receive a portion of any remaining Trust property. The Trust was a "living" or "inter vivos" trust, in which Darlene "reserve[d] the right to amend, modify, or revoke the Trust in whole or in part, including the principal, and the present or past undisbursed income from such principal." The document states that "revocation or amendment ... may be in whole or in part by written instrument." And the Trust provides that "[t]he interests of the beneficiaries are presently vested interests subject to divestment which shall continue until this Trust is revoked or terminated other than by death."

¶ 3 In 2006, Darlene executed the Amendment. The purpose of the Amendment was to remove Darlene's son Ron as a beneficiary of the Trust. The Amendment stated, "I have intentionally not provided anything for my son Ronald S. Patterson (or his descendants) since I have already properly provided for this son during his lifetime as I felt was appropriate." Eleven months after executing the Amendment, Darlene passed away.

¶ 4 Shortly after his mother passed away, Ron filed a lawsuit against the Trust and Darlene's estate in which he sought a declaration that the Amendment was void because it violated the terms of the Trust.[2] Subsequently, Ron sought partial summary judgment. He argued that the Amendment was void under our decision in *Banks v. Means*, 2002 UT 65, 52 P.3d 1190. Randy responded with his own motion for partial summary judgment in which he sought to validate the Amendment. Randy did not raise the UUTC in either his motion or his memorandum in opposition to Ron's motion. But he did ask

---

2. Ron's amended complaint contained eleven causes of action. Only the first cause of action is at issue in this appeal.

the court to either distinguish or "overturn" *Banks*.

¶ 5 The district court granted Ron's motion for partial summary judgment and denied Randy's cross-motion. Concluding that it was bound by *Banks* and its progeny, the district court ruled that the Amendment was invalid because it attempted to completely divest Ron of his interest in the Trust without revoking the Trust, as required by *Banks*.

¶ 6 Randy filed a petition for interlocutory appeal, which we granted. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j).

### STANDARD OF REVIEW

¶ 7 Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. UTAH R. CIV. P. 56(c). When reviewing the district court's ruling on a motion for summary judgment, "we consider the facts and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 2011 UT 33, ¶ 3 n. 2, 258 P.3d 539 (internal quotation marks omitted). We review the district court's grant of summary judgment for correctness, giving no deference to the district court's legal conclusions. *Id.* ¶ 18.

### ANALYSIS

¶ 8 Randy argues that the district court erred in deciding the case under *Banks v. Means*, 2002 UT 65, 52 P.3d 1190, and in concluding that the Amendment was void. He asks us to validate his mother's intent to terminate Ron's interest by overruling *Banks*. In the alternative, Randy asks us to apply a provision of the UUTC, which he contends has statutorily overruled *Banks*. Ron responds that *Banks* remains good law and should not be overruled by this court. He also contends that the UUTC did not overrule *Banks* and that, in any event, we should not consider Randy's statutory argument because Randy raised it for the first time on appeal.

¶ 9 Our preservation rules do not preclude Randy from arguing that the UUTC has statutorily overruled *Banks*. And, after considering Randy's argument, we conclude that the UUTC has statutorily overruled *Banks*. The UUTC, which allows for liberal modification of revocable trusts, directly conflicts with our holding in *Banks* that a settlor must strictly comply with the terms of a trust in order to modify it. Applying the UUTC to the undisputed facts in this case, we hold that the Amendment effectively terminated Ron's interest in the Trust.

### I. WE WILL NOT IGNORE THE UUTC EVEN THOUGH RANDY DID NOT ARGUE ITS APPLICABILITY BELOW

¶ 10 We first consider whether Randy is barred from arguing the applicability of the UUTC. Randy concedes that he did not raise the UUTC in the trial court. And he does not argue the applicability of any of the exceptions to our preservation requirement. Rather, he contends he raised and argued the broader issue of whether Darlene's Amendment is valid and suggests that the UUTC is simply one of the arguments supporting the validity of the Amendment. In Randy's view, his argument that the Amendment is valid under the UUTC is properly before us because it goes to the ultimate issue decided by the district court. Ron counters by attempting to frame the "issue" more narrowly. As Ron sees it, the issue decided below was whether Darlene's Amendment was valid under *Banks* and its progeny.

¶ 11 We take this occasion to discuss our preservation requirement and to clarify its application. Randy attempts to avoid our preservation rule by broadly defining the "issue" decided by the district court. We reject this approach. Nonetheless, we hold that our preservation rule does not prevent Randy from arguing the applicability of the UUTC because the UUTC is controlling authority that directly bears upon the issue that Randy did raise—whether our holding in *Banks* should be overruled.

¶ 12 We generally will not consider an issue unless it has been preserved for

appeal. *See J.M.W. v. T.I.Z. (In Re Adoption of Baby E.Z.)*, 2011 UT 38, ¶ 25, 266 P.3d 702.[3] An issue is preserved for appeal when it has been "presented to the district court in such a way that the court has an opportunity to rule on [it]." *Id.* (internal quotation marks omitted).

■ ¶ 13 Our preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction. Consequently, we exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal. We have exercised this discretion to recognize some limited exceptions to our general preservation rule. For example, we have reached matters not raised below under "exceptional circumstances," or when "plain error" has occurred. *See, e.g., Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 17, 266 P.3d 671. And we have considered unpreserved constitutional arguments where a person's liberty is at stake. *See Pratt v. City Council of Riverton*, 639 P.2d 172, 173–74 (Utah 1981).[4]

¶ 14 Randy has asked us to draw a distinction between "issues" and "arguments" when determining whether to apply our preservation rule. Courts in some jurisdictions have recognized a distinction between new "issues" or "theories" and new "arguments," allowing the latter but not the former to be raised for the first time on appeal. *See, e.g.,*

*Kerbs v. Cal. E. Airways, Inc.*, 90 A.2d 652, 659 (Del.1952) (refusing to permit a party to raise an "entirely new theory of his case," but allowing a new argument that "is merely an additional reason in support of a proposition urged below"). But we have expressly "decline[d] to honor such a distinction." *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 455 n. 31 (Utah 1993).[5] Consistent with this practice, Utah appellate courts have used the words "issue," "claim," "argument," and "matter" almost interchangeably when stating our preservation rule. *See, e.g., Jacob v. Bezzant*, 2009 UT 37, ¶ 34, 212 P.3d 535 ("[W]e do not address *arguments* brought for the first time on appeal unless the [district] court committed plain error or exceptional circumstances exist." (second alteration in original) (emphasis added) (internal quotation marks omitted)); *State v. Cruz*, 2005 UT 45, ¶ 33, 122 P.3d 543 ("As a general rule, *claims* not raised before the trial court may not be raised on appeal." (emphasis added) (internal quotation marks omitted)); *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998) ("[T]o preserve an *issue* for appellate review, a party must first raise the *issue* in the trial court." (emphasis added)); *Franklin Fin. v. New Empire Dev. Co.*, 659 P.2d 1040, 1044 (Utah 1983) ("[M]atters not presented to the trial court may not be raised for the first time on appeal." (emphases added)).[6]

**3.** *See also Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is the general rule ... that a federal appellate court does not consider an issue not passed upon below."); *LeBaron & Assocs., Inc. v. Rebel Enters., Inc.*, 823 P.2d 479, 483 (Utah Ct.App.1991) ("Issues not raised in the trial court in timely fashion are deemed waived, precluding [the appellate court] from considering their merits on appeal." (alteration in original) (internal quotation marks omitted)); 5 Am.Jur.2d *Appellate Review* § 618 (2011) ("It is axiomatic that an appellate court will generally not review any issue not raised in the court below.").

**4.** Of course, a court's subject matter jurisdiction may be challenged at any time, and an appellate court has no discretion whether to consider the challenge. *See* Utah R. Civ. P. 12(h)(2) (stating that "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"); *see also In Re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 25, 266 P.3d 702 ("Because

subject matter jurisdiction goes to the heart of a court's authority to hear a case, it is not subject to waiver and may be raised at any time, even if first raised on appeal." (citation omitted)).

**5.** *See also In re Estate of Sims*, 918 P.2d 132, 134 n. 2 (Utah Ct.App.1996) (rejecting appellant's attempt to avoid the preservation rule by characterizing estoppel as a new argument rather than a new issue).

**6.** Utah's appellate courts are not alone in conflating the terms "issue," "argument," "matter," and "theory." *See, e.g., Wingert v. Yellow Freight Sys., Inc.*, 146 Wash.2d 841, 50 P.3d 256, 262 (2002) (arguments); *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wash.2d 29, 42 P.3d 1265, 1268 (2002) (en banc) (issues); *Washburn v. Beatt Equip. Co.*, 120 Wash.2d 246, 840 P.2d 860, 884 (1992) (theories); *Matthias v. Lehn & Fink Prods. Corp.*, 70 Wash.2d 541, 424 P.2d 284, 285 (1967) (matters); *see also Flores v. Am. Pharm. Servs., Inc.*, 994 P.2d 455, 458 (Colo.App. 1999) (stating that an appellate court will not

¶ 15 The above cases in which Utah courts have conflated the words "issue," "claim," "argument," and "matter" demonstrate that semantics alone cannot be our guide in applying our preservation rule. Rather, in assessing application of our preservation rule, we find it useful to examine its underlying policies. The two primary considerations underlying the rule are judicial economy and fairness. The preservation rule furthers judicial economy in a number of ways. First, requiring a party to raise an issue or argument in the trial court gives "the trial court an opportunity to address the claimed error, and if appropriate, correct it." *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 20, 163 P.3d 615 (internal quotation marks omitted). This "avoid[s] unnecessary appeals and retrials." *Smith v. Shannon*, 100 Wash.2d 26, 666 P.2d 351, 358 (1983). Second, "[o]rderly procedure ... requires that a party must present his entire case and his theory ... of recovery to the trial court." *Dansie v. City of Herriman*, 2006 UT 23, ¶ 30, 134 P.3d 1139 (first and second alterations in original) (internal quotation marks omitted). The policy of judicial economy is most directly frustrated when an appellant asserts unpreserved claims that require factual predicates. For this reason, the preservation rule should be more strictly applied when the asserted new issue or theory "depends on controverted factual questions whose relevance thereto was not made to appear at trial." *James v. Preston*, 746 P.2d 799, 801 (Utah Ct.App.1987) (internal quotation marks omitted); *see also Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 672 (Utah 1982) (holding that an issue was not properly before the court on appeal because the trial court did not have the opportunity to make any findings of fact regarding it).

¶ 16 The second consideration underlying the preservation rule is fairness. It generally would be unfair to reverse a district court for a reason presented first on appeal. *See, e.g., Nielsen v. Brocksmith*, 323 Mont. 98, 99 P.3d 181, 184 (2004). Under our adversary system, the responsibility for detecting error is on the party asserting it, not on the court. Notions of fairness therefore dictate that a party should be given an opportunity to address the alleged error in the trial court. Having been given such a chance, the party opposing a claim of error might have countered the argument, potentially avoiding the time and expense of appeal. Finally, "requiring preservation of an issue prevents a party from avoiding the issue at trial for strategic reasons only to raise the issue on appeal if the strategy fails." *Tschaggeny*, 2007 UT 37, ¶ 20, 163 P.3d 615.

¶ 17 This court and the Utah Court of Appeals have on countless occasions exercised our discretion to refuse to consider new issues, arguments, claims, or matters on appeal. *See, e.g., Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶¶ 42–43, 104 P.3d 1208 (refusing to consider appellant's argument that it was entitled to attorney fees under the private attorney general doctrine because the issue was not argued below); *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶¶ 50–52, 99 P.3d 801 (declining to address appellant's challenge to the district court's findings of fact because the district court had not been sufficiently "alerted" to the error claimed on appeal); *Shayne v. Stanley & Sons, Inc.*, 605 P.2d 775, 776 (Utah 1980) (rejecting appellant's negligence claim because it was not argued below); *Preston*, 746 P.2d at 801 (refusing to address appellant's equitable mortgage theory because appellant did not raise it sufficiently before the district court).

¶ 18 But we routinely consider new authority relevant to issues that have properly been preserved,[7] and we have never prevented a party from raising controlling authority that directly bears upon a properly preserved issue. Further, we are unwilling to disregard controlling authority that bears upon the ultimate resolution of a case solely because the parties did not raise it below. That is the case here. Randy argued below that *Banks* should be overruled. Although

consider issues, arguments, or theories not presented below).

7. For example, we have always allowed parties to supplement an argument with new cases or relevant legislative history that they did not raise in the district court.

he did not raise the UUTC, the inescapable fact is that the legislature overruled *Banks* when it enacted the UUTC. We cannot ignore such controlling legislation.

¶ 19 We acknowledge that our decision to reach Randy's argument may undermine some of the policies underlying the preservation requirement. For example, had Randy raised and argued the applicability of the UUTC in the district court, the court may have ruled in Randy's favor and this appeal would have been avoided. In addition, it is not entirely fair to characterize the district court's ruling as "error" because it did not have the statute before it.

¶ 20 But there are other important considerations that cut against application of the preservation rule in this situation. First, consideration of the UUTC is necessary to a proper decision. As the state's highest court, we have a responsibility to maintain a sound and uniform body of precedent and must apply the statutes duly enacted into law. Refusing to consider Randy's statutory argument in this case would cause us to issue an opinion in contravention of a duly enacted controlling statute. This we will not do. *See Kaiserman Assocs., Inc. v. Francis Town,* 977 P.2d 462, 464 (Utah 1998) ("In our view, an overlooked or abandoned argument should not compel an erroneous result. We should not be forced to ignore the law just because the parties have not raised or pursued obvious arguments.").[8] Second, the issue of whether and how the UUTC applies is one that can be resolved purely as a matter of law. Third, the failure to raise the argument below appears to have been inadvertent, rather than tactical, because we can conceive of no way in which Randy would derive an advantage from reserving the statutory argument for appeal rather than raising it in the district court. Fourth, parties have an ethi-

cal obligation to disclose adverse authority to the court. *See* Utah R. Prof'l Conduct 3.3(a)(2) ("A lawyer shall not knowingly ... fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel....").[9] And the failure to raise the controlling statute in the district court is a failure that can be appropriately assigned to counsel for both parties. Were we to refuse to apply the UUTC here, it could incentivize attorneys to disregard their ethical obligation to point out controlling adverse authority.

¶ 21 In summary, we decline to ignore controlling law because counsel failed to argue it below. We therefore consider Randy's argument that the Amendment is valid under section 75–7–605 of the UUTC.

## II. THE UUTC SUPERSEDES *BANKS*

¶ 22 Having decided to reach the merits of Randy's argument, we now consider whether *Banks* or the UUTC controls the validity of Darlene's Amendment. Randy argues that the statute governs. He contends that *Banks* has been effectively overruled by the UUTC. Specifically, he argues that *Banks'* holding that a settlor must strictly comply with the terms of a revocable trust in order to divest a beneficiary of an interest directly conflicts with the provisions of the UUTC, which allow for liberal amendment of such trusts. Ron responds that the statute does not conflict with the *Banks'* holding that a settlor must entirely revoke, rather than amend, a trust in order to divest the interest of a beneficiary. We agree with Randy.

¶ 23 We begin with a discussion of relevant case law. Three times in the past decade, this court has examined the validity of trust amendments that reduced or eliminated the interests of beneficiaries in revocable trusts.

---

**8.** *See also United States v. Certain Parcels of Land in Philadelphia,* 144 F.2d 626, 630 (3d Cir.1944) ("The appropriate law must be applied in each case and upon a failure to do so appellate courts should remand the cause to the trial court to afford it opportunity to apply the appropriate law, even if the question was not raised in the court below."); *Adkins v. Uncle Bart's, Inc.,* 2000 UT 14, ¶ 40, 1 P.3d 528 (same); *Thurston v. Box Elder Cnty.,* 835 P.2d 165, 168 n. 3 (Utah 1992) (holding that, despite the parties' failure to ad-

dress a controlling statute, "[w]e consider the statute's effect on this case sua sponte because it is controlling and it would be contrary to public policy to decline to do so").

**9.** We do not intend to suggest that counsel for either party has violated this rule. Indeed, the failure to raise the UUTC appears to be the result of inadvertence.

In *Banks v. Means*, 2002 UT 65, 52 P.3d 1190, the settlor had executed a trust instrument in which her children were named as joint beneficiaries. *Id.* ¶ 3. In the trust instrument, the settlor reserved "the right to amend, modify or revoke th[e] Trust in whole or in part." *Id.* ¶ 4. The trust also stated that "[o]n the revocation of this instrument in its entirety, the Trustee shall deliver to the [settlor] . . . all of the Trust property." *Id.* The *Banks* trust also provided that the interests of the beneficiaries were "vested interests subject to divestment which shall continue until this Trust is revoked or terminated other than by death." *Id.*

¶ 24 Days before her death, the settlor executed an amendment to the trust. *Id.* ¶ 5. Under the terms of the amendment, the settlor's sister became the primary beneficiary and the settlor's children became alternate beneficiaries, who would take only if the settlor's sister predeceased her. *Id.* The children challenged the amendment. *Id.* ¶ 6.

¶ 25 We began our analysis by reciting the general common law rule that "[a] trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries." *Id.* ¶ 9 (alteration in original) (internal quotation marks omitted). We also stated that "[t]he creation of a trust involves the transfer of property interests" which "cannot be taken from [the beneficiaries] except in accordance with a provision of the trust instrument." *Id.* (alterations in original) (internal quotation marks omitted).

¶ 26 Applying this general framework, we concluded that although the settlor expressly reserved the right to amend, modify, or revoke the trust, she had also created vested interests in her children by specifically providing that those interests would continue until the trust was revoked or terminated. *Id.* ¶ 12. Thus, we concluded that a complete revocation was required to "divest" a beneficiary's interest. *Id.* Because the settlor had only amended the trust rather than completely revoking it, we held that her attempt to terminate the interests of her children was invalid. *Id.* ¶ 16.

¶ 27 We revisited the issue just nine months later in *Flake v. Flake (In re Estate of Flake*, 2003 UT 17, 71 P.3d 589). There, the settlor had amended his revocable "living trust" to reduce a beneficiary's interest. *Id.* ¶ 6. Much like the *Banks* trust, the *Flake* trust purported to grant the beneficiaries "a present vested interest which shall continue until the Trust is revoked or terminated other than by death." *Id.* ¶ 17. The trust provided for amendment or revocation in language that was substantially similar to that found in the *Banks* trust. *See id.* ¶ 5. The adversely affected beneficiary challenged the amendment, arguing that the settlor's attempt to reduce her interest was invalid under *Banks*. *See id.* ¶ 7. We rejected the argument because the *Flake* amendment simply modified the "quality, or scope, of the beneficial interest" and therefore "the beneficial interest . . . was merely amended, and not completely divested" as it had been in *Banks*. *Id.* ¶ 17.

¶ 28 In *Flake*, we distinguished *Banks* by noting that the primary effect of the "present vested interest" language used in the *Banks* and *Flake* trusts was "to save the Trust from the doctrine of merger and to prove that the Trust [was] not illusory." *Id.* And we recognized that the use of that language was a product of our holding in *Groesbeck v. Groesbeck (In re Estate of Groesbeck)*, 935 P.2d 1255, 1257–58 (Utah 1997), where we concluded that a revocable trust would be deemed illusory unless it purported to create "vested interests" in the beneficiaries. *See In re Estate of Flake*, 2003 UT 17, ¶ 17 n. 2, 71 P.3d 589. In so doing, we tacitly rejected the suggestion that the settlor used this language with the intent to limit his ability to amend or modify the disposition of his assets.

¶ 29 Our most recent decision addressing the issue presented here is *Hoggan v. Hoggan*, 2007 UT 78, 169 P.3d 750. In *Hoggan*, we faced a nearly identical question to the one we addressed in *Flake*. The original trust instrument provided that the settlor's three children were to each receive one-third of the trust property upon the settlor's death. *Id.* ¶ 2. The settlor amended the trust to provide that one of the sons was to receive only forgiveness of any remaining indebted-

ness he owed to the settlor. *Id.* ¶ 3. We upheld the validity of the amendment and again distinguished *Banks* by noting that "[b]ecause [the beneficiary's] interest in the trust was not completely divested but only modified, the amendment does not violate the terms of the trust and is therefore valid." *Id.* ¶ 13.

¶ 30 In a lengthy footnote, we reiterated and elaborated upon our concerns regarding language in revocable living trusts that purported to give beneficiaries "present vested interests." *Id.* ¶ 11 n. 2. We characterized the use of this language as "unfortunate[ ]" because it has "the potential to produce results not within the contemplation of the drafters of trusts or their clients." *Id.* And we noted the language "simply contradicts the operative terms of the trust" because in revocable trusts "the beneficiaries have no immediate right of possession or enjoyment of the trust property." *Id.* "[T]rusts in which the settlor retains the right to amend or revoke the instrument do not convey 'presently vested rights' to beneficiaries because their interests are contingent upon the settlor not amending or revoking the trust." *Id.* And we expressly disavowed the requirement that a revocable trust create "vested interests" in order to be deemed nonillusory. *Id.*

¶ 31 In summary, *Banks* held that the settlor of a revocable trust could terminate the interest of a beneficiary only by completely revoking the trust. But in *Flake* and *Hoggan*, we held that a settlor could significantly reduce a beneficiary's interest by mere amendment. In other words, the settlor of a revocable trust could not wholly eliminate a beneficiary's interest by amendment but could effectively do so by reducing the interest to a trifle.

¶ 32 Significantly, we did not consider or apply statutory law in any of these cases

because revocable trusts were not among the limited topics addressed by Utah's Uniform Probate Code. *See* Utah Code Ann. §§ 75–1–101 to –8–101 (1993) (repealed 2004). Rather, all three cases were decided exclusively as a matter of common law.[10]

¶ 33 In 2004, the Utah Legislature enacted the UUTC.2004 Utah Laws 332. The UUTC governs the creation, administration, and adjudication of trusts. *See* Utah Code Ann. §§ 75–7–401 to –417 (Supp.2011). It "applies to ... all trusts created before, on, or after July 1, 2004[and] all judicial proceedings concerning trusts commenced on or after July 1, 2004." *Id.* § 75–7–1103(1)(a)–(b). Courts must apply the UUTC "liberally ... to promote its underlying purposes and policies," one of which is "[t]o discover and make effective the intent of a decedent in distribution of his property." *Id.* § 75–1–102(1), (2)(b) (1993).

¶ 34 The UUTC contains an article dedicated solely to revocable trusts. *Id.* §§ 75–7–604 to –607 (Supp.2011). The structure and content of the article reflects a legislative acknowledgment of the increasingly widespread use of revocable trusts as substitutes for wills.[11] For example, the UUTC provides that the capacity standard for wills applies in determining whether a settlor had capacity to create a revocable trust. *Id.* § 75–7–604 ("The capacity required to create, amend, [or] revoke ... a revocable trust ... is the same as that required to make a will."). And, like challenges to wills, challenges to revocable trusts must be brought within a limited amount of time after the settlor's death. *Compare id.* § 75–7–607(1) (Supp.2011) (providing that a challenge must be commenced by the earlier of three years after the settlor's death or "90 days after the trustee sent the person a copy of the trust instrument and a notice informing the person of the trust's existence, of the trustee's name

**10.** Although *Hoggan* was not decided until 2007—after the UUTC was enacted—the parties in that case never raised the UUTC, and the court was apparently unaware of its passage.

**11.** According to at least one legal scholar, revocable trusts are now the most commonly used trust in the United States. David M. English, *The Uniform Trust Code (2000): Significant Provisions and Policy Issues,* 67 Mo L.Rev. 143, 186 (2002). This rise in popularity owes largely to the benefits revocable trusts offer over wills, the most significant of which is the avoidance of probate. *See* S. Alan Medlin, *The Impact of Significant Substantive Provisions of the South Carolina Trust Code,* 57 S.C. L.Rev. 137, 140–41 (2005).

and address, and of the time allowed for commencing a proceeding"), *with id.* § 75–3–107(1) (1993) (stating that "[n]o informal probate or appointment proceeding ... may be commenced more than three years after the decedent's death").

¶ 35 Most importantly, the UUTC treats a living trust as the functional equivalent of a will. Indicative of this fact is the UUTC's treatment of revocation and amendment. It is black letter law that a testator has complete control to amend, modify, or revoke his will during his lifetime. *E.g.,* 79 Am.Jur. 2d *Wills* § 500 (1975) ("Revocability is an essential characteristic of a will.... Wills are revocable to such an unlimited degree that even an express provision in a will providing that it is not revocable [does not] prevent [revocation]."). Similarly, the UUTC recognizes that during the period in which a revocable trust is in effect, all of the rights held by beneficiaries are controlled exclusively by the settlor. Utah Code Ann. § 75–7–606(1) (Supp.2011) ("While a trust is revocable and the settlor has the capacity to revoke the trust, rights of the beneficiaries are subject to the control of ... the settlor."). Thus, just as a testator has flexibility over the manner in which he can revoke all or part of his will, *id.* § 75–2–507, the UUTC contains a provision giving a settlor wide latitude to effectuate his control over the disposition of trust assets. Specifically, section 75–7–605(3) allows a settlor to revoke, amend, or modify a revocable trust in any of the following ways:

(a) by substantially complying with a method provided in the terms of the trust; or

(b) if the terms of the trust do not provide a method or the method provided in the terms is not expressly made exclusive, by:

(i) executing a later will or codicil that expressly refers to the trust or specifically devises property that would otherwise have passed according to the terms of the trust; or

(ii) any other method manifesting clear and convincing evidence of the settlor's intent.

*Id.* § 75–7–605(3).

¶ 36 This section of the UUTC directly conflicts with the holding of *Banks.* Under

*Banks,* the settlor's intent at the time of creation of the trust was paramount because "[o]nce the settlor has created the trust he is no longer the owner of the trust property and has only such ability to deal with it as is expressly reserved to him in the trust instrument." *Banks,* 2002 UT 65, ¶ 9, 52 P.3d 1190 (internal quotation marks omitted). Thus, in *Banks* we noted that "a settlor has the power to modify or revoke a trust only if and to the extent that such power is explicitly reserved by the terms of the trust." *Id.* Under this framework, a settlor may revoke or amend the trust only by strictly complying with its terms. *See id.* ¶ 12 (holding that the settlor could divest the beneficiaries of their vested interests only by completely revoking the trust because she had limited her ability to eliminate the beneficiaries' interests by including language in the trust stating that the "interests of the beneficiaries ... shall continue until this Trust is revoked or terminated" (internal quotation marks omitted)). In contrast, the UUTC does not require strict compliance with trust provisions governing revocation or amendment. And unless the trust document specifies a method of amendment that is expressly made exclusive, the UUTC provides a settlor of a revocable trust with wide latitude in the method of amendment, revocation, or modification. While *Banks* was singularly focused on the settlor's intent at the time of the trust's creation, the UUTC is not. Rather, the UUTC strives to effectuate the settlor's subsequent intent, an end that is consistent with the UUTC's treatment of revocable trusts as will equivalents. *See* Utah Code Ann. § 75–7–605(3).

¶ 37 It is axiomatic that our precedent must yield when it conflicts with a validly enacted statute. *E.g., Gottling v. P.R. Inc.,* 2002 UT 95, ¶ 7, 61 P.3d 989. By enacting the UUTC, the legislature has demonstrated its intent to treat revocable living trusts as will equivalents. Like a will, over which the testator has absolute control until the testator's death, the UUTC provides the settlor of a revocable trust ·with complete control over the trust until the settlor's death. To achieve this end, the UUTC allows settlors multiple avenues to amend or

revoke a revocable trust. When the UUTC is read together with the legislative directive to liberally construe it in a manner effectuating the intent of settlors, it directly conflicts with the strict compliance standard that we articulated in *Banks*. Therefore, our *Banks* holding must give way to the statute.

## III. DARLENE PROPERLY TERMINATED RON'S INTEREST IN THE TRUST BY COMPLYING WITH UTAH CODE SECTION 75–7–605

¶ 38 Having determined that the UUTC, rather than *Banks*, controls this case, we now apply the statute to determine the validity of Darlene's Amendment. Randy argues that the Amendment is valid because the terms of the Trust do not provide an exclusive method of amendment or revocation and the Amendment qualifies as a clear expression of Darlene's intent to terminate Ron's interest as a beneficiary. We agree.

¶ 39 Under section 75–7–605, a "settlor may revoke or amend a revocable trust ... by substantially complying with a method provided in the terms of the trust." UTAH CODE ANN. § 75–7–605(3)(a) (Supp.2011). Alternatively, if the terms of a revocable trust do not provide a method for revocation or amendment that is "expressly made exclusive," the settlor may amend or revoke the trust by "any ... method manifesting clear and convincing evidence of the settlor's intent." *Id.* § 75–7–605(3)(b)(ii).

¶ 40 Here, the Trust purported to grant the beneficiaries "presently vested interests subject to divestment which shall continue until this Trust is revoked or terminated other than by death." As expressly recognized in *Hoggan*, this language does not actually create a "present" or "vested" interest. 2007 UT 78, ¶ 11 n. 2, 169 P.3d 750. Rather, it creates a future interest that is contingent upon a host of factors including the beneficiary's surviving the settlor, the existence of property in the trust corpus at the time of the settlor's death, and the settlor not amending or revoking the trust. *Id.* In the Trust document, Darlene "reserve[d]

the right to amend, modify or revoke the Trust in whole or in part." And the Trust states that "revocation or amendment ... may be in whole or in part by written instrument."

¶ 41 We conclude that the terms of the Trust do not provide a method for amendment or revocation that is expressly made exclusive. The Trust states that it "may" be amended or revoked by written instrument "delivered in writing to the then acting Trustee." But it does not expressly state that this is the *only* permissible method.[12] Thus, under the provisions of the UUTC, Darlene could amend or revoke the trust by "any ... method manifesting clear and convincing evidence of [her] intent." UTAH CODE ANN. § 75–7–605(3)(b)(ii). The Amendment satisfies this requirement. In it, Darlene specifically revised the distribution provisions of the Trust, stating, "I have intentionally not provided anything for my son Ronald S. Patterson (or his descendants) since I have already properly provided for this son during his lifetime as I felt was appropriate." In so doing, Darlene modified that part of the Trust instrument that named Ron as a beneficiary. And she did so in a manner that provides clear and convincing evidence of her intent to eliminate Ron's interest in the Trust. Thus, the Amendment is valid.

## CONCLUSION

¶ 42 We reverse the district court's ruling granting Ron's motion for partial summary judgment and denying Randy's cross-motion. Although we acknowledge that Randy did not raise the UUTC in the district court, he did argue that the rule we articulated in *Banks* should be overruled. And because the legislature effectively overruled *Banks* when it passed the UUTC, we are obliged to apply the controlling statute.

¶ 43 The UUTC seeks to effectuate settlors' intent by allowing for liberal amendment or revocation of revocable trusts. Applying the UUTC to the facts of this case, we hold that Darlene's Amendment is valid.

---

**12.** Language is "express" when it is "directly stated." BLACK'S LAW DICTIONARY 661 (9th ed.2009). *See also id.* (defining "expressed" as

"[d]eclared in direct terms; stated in words; not left to inference or implication").

The terms of the Trust do not specify an exclusive method for amendment or revocation and the Amendment constitutes a clear expression of Darlene's intent to terminate Ron's interest.

¶ 44 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice NEHRING, and Justice LEE concur in Justice PARRISH's opinion.