**2024 UT App 64**

# THE UTAH COURT OF APPEALS

JOHN ABU-ULBA,
Appellant,
*v.*
ANANDA SCIENTIFIC, INC. AND MARK J. ROSENFELD,
Appellees.

Opinion
No. 20220733-CA
Filed May 2, 2024

Third District Court, Salt Lake Department
The Honorable Kent R. Holmberg
No. 190903831

Troy L. Booher, Beth E. Kennedy, Taylor P. Webb,
and Kenneth L. Reich, Attorneys for Appellant

Timothy R. Pack, Attorney for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1 After their hemp-related business deal went bad, John Abu-Ulba sued Ananda Scientific, Inc. and Mark Rosenfeld, Ananda's founder and CEO. At the close of a bench trial, the district court ruled in Abu-Ulba's favor on one of his claims and awarded him $345,000 in damages. Abu-Ulba now appeals that damages award, arguing that the district court used the wrong methodology for calculating damages. But because the argument that Abu-Ulba makes on appeal was unpreserved below, we affirm.

## BACKGROUND[1]

*Abu-Ulba's Employment with Ananda*

¶2     In 2012, John Abu-Ulba was running an online hemp seed company that he had founded, when a representative from Ananda contacted him. At the time, Ananda was developing plant-derived products, and it believed that it could benefit from Abu-Ulba's expertise in the hemp food industry. In the course of the ensuing discussions, some of Ananda's officers and directors, including Rosenfeld, made representations to Abu-Ulba about the existence of patents, the progress of clinical trials, and the credentials and reputation of company leadership.

¶3     In reliance on these representations, Abu-Ulba began "informally raising capital" for Ananda and taking research trips with Rosenfeld. In January 2014, Abu-Ulba began working for Ananda as its executive vice president, a part-time role that permitted him to keep managing his own company. Three months later, Ananda offered Abu-Ulba the position of chief operating officer (COO), which he accepted, again relying on the representations about the health of the company's business.

¶4     Because the COO position would require Abu-Ulba to divert his energies and efforts away from his own company, Abu-Ulba negotiated a compensation package in which he would receive both a salary and stock options. This employment contract contained the following terms:

---

1. Following a bench trial, we recite the facts from the record in the light most favorable to the findings of the trial court and present conflicting evidence only as necessary to understand issues raised on appeal. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, n.1, 507 P.3d 357.

- a base salary of $5,000 per month;

- an additional salary of $5,000 per month that would be triggered "once the company had a product and was making sales";

- two weeks' vacation pay per year; and

- stock options for up to one million shares of Ananda common stock, half of which would vest automatically, with the other half vesting at a rate of 50,000 shares per quarter.

¶5    In addition to the employment contract, Abu-Ulba and Ananda agreed to an Incentive Stock Option Agreement (the ISOA). Under its terms, the "exercise price" for the aforementioned shares would be set at "$.85 per share." The ISOA also required the exercise price to be "at least 100% of fair market value on [the] Date of Grant."[2]

---

2. As indicated, the ISOA used the term "exercise price." But when describing this same "$.85 per share" price, the district court typically referred to it as a "strike price," and Abu-Ulba's brief does too. Of note, Black's Law Dictionary seems to regard the two terms as being equivalent. *See Exercise price*, Black's Law Dictionary (11th ed. 2019) (referring the reader to the entry for "strike price"); *Price*, Black's Law Dictionary (11th ed. 2019) (stating that a "strike price" is "[a]lso termed . . . [an] exercise price"). Our survey of cases from other jurisdictions does reveal some cases that draw subtle distinctions between the concepts, but many other cases treat them synonymously. For consistency, we'll follow the lead of the district court and refer to this as the "strike price" moving forward.

(continued…)

¶6     In August 2014, Abu-Ulba exercised his options for 550,000 shares of stock. But when he did so, Abu-Ulba did not actually pay the strike price. Instead, he received the shares in exchange for signing a non-recourse promissory note (the Promissory Note).[3] Under the terms of the Promissory Note, Abu-Ulba would be required to repay $467,500 if he ever sold the shares—an amount that equaled the strike price ($.85 per share) times the number of shares at issue (550,000). The parties also separately agreed, however, that the Promissory Note "would be forgiven and never enforced." As later noted by the district court, this combined arrangement meant that Abu-Ulba actually "paid $0, in monetary form, for his 550,000 shares." The district court also found that those shares were intended to be "part of his compensation"—i.e., that Abu-Ulba "provided services as an employee to Ananda in return for the shares."[4]

---

In terms of what a strike price is, Black's defines a "strike price" as the "price for which a security will be bought or sold under an option contract if the option is exercised." *Price,* Black's Law Dictionary (11th ed. 2019).

3. "Nonrecourse" means "[o]f, relating to, or involving an obligation that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets." *Nonrecourse*, Black's Law Dictionary (11th ed. 2019). A nonrecourse promissory note "has the effect of making a note payable out of a particular fund or source, namely, the proceeds of the sale of the collateral securing the note." *Fein v. R.P.H., Inc.,* 68 S.W.3d 260, 266 (Tex. App. 2002).

4. The district court thought it was "unclear . . . why this method of issuing promissory notes which were forgiven was advantageous to Ananda." For what it's worth, Abu-Ulba indicated below that this was done for tax purposes.

¶7 During a mid-2015 trip to Israel, which was the site of many of the relationships and projects about which Ananda had made representations to Abu-Ulba, Abu-Ulba learned that "Ananda's contracts and activities in Israel were essentially non-existent or materially less significant than had been represented." Many of Ananda's board members resigned around this time, likely in response to discovering this same information, but Abu-Ulba continued working for the company for two more years. He later explained that he did so "in order to make the misrepresentations true and to recoup the time and effort that he sunk into Ananda."

¶8 Consistent with the employment contract, Ananda increased Abu-Ulba's salary to $10,000 per month in 2016, which was around the time that it began selling its product. In July 2017, however, Ananda fired Abu-Ulba.

*The Suit*

¶9 In May 2019, Abu-Ulba sued Ananda, asserting causes of action for (1) wrongful termination, (2) breach of employment agreement, (3) breach of agreement to issue options, (4) breach of bonus plan agreement, (5) the unlawful offer or sale of securities in violation of the Utah Uniform Securities Act, and (6) fraud in the offer or sale of securities. The first and fourth causes of action were dismissed before trial. The other claims proceeded to a seven-day bench trial. At the close of trial, the district court found that Abu-Ulba had failed to carry his burden on his second and third claims and that the statute of limitations had run for the sixth.

¶10 But the court ruled in Abu-Ulba's favor on his fifth claim, which, again, alleged the unlawful offer or sale of securities in violation of the Utah Uniform Securities Act. In a written decision that it issued after trial, the court ruled that Abu-Ulba had proved that Ananda had made material misrepresentations to him and

that those misrepresentations had induced him to work in exchange for the stock options that he had exercised (which, again, were for 550,000 shares of stock).[5]

¶11 Turning to the question of damages, the court noted that under the controlling statute, Abu-Ulba was entitled to receive "the consideration paid for the security," which could be trebled, and that he could also receive interest and attorney fees. *See* Utah Code § 61-1-22(1)(b), (2). But the court then observed that "[n]either party ha[d] suggested how the court should determine consideration paid for the securities" and that "neither party developed this evidence at trial."[6]

¶12 Without such guidance from the parties, the court was left to decide for itself how to value the "consideration paid for the security." The court then surmised that, "[i]n theory," it could

---

5. Abu-Ulba never exercised his options for additional tranches of shares. In his third cause of action, however, Abu-Ulba claimed that he was entitled to exercise those options and that he was entitled to an additional one million shares as a result of a separate promise. As noted, the court ruled against Abu-Ulba on that claim, and Abu-Ulba does not challenge that decision on appeal. Thus, although Abu-Ulba requested damages relating to all of the options "exercised or to be exercised," the only options at issue in this appeal are those relating to the 550,000 shares of stock that he'd already received.

6. Indeed, when Abu-Ulba's counsel was pressed during closing argument as to how he thought the court should value the consideration Abu-Ulba paid for the stock, counsel floated a couple of potential theories—such as looking to "the value of . . . the services he provided" that was reflected "at least in part in his testimony about his . . . salary escalations"— but counsel then told the court that he ultimately saw "no way of figuring" out a "strict dollar number" to value that consideration.

value this consideration in one of three ways: (1) by determining the fair market value of the shares in 2014; (2) by using the value that was seemingly attached to the shares through the strike price from the ISOA and the repayment amount set forth in the Promissory Note; or (3) by using the "under-compensation" in Abu-Ulba's initial salary as a proxy for the value of the shares that Abu-Ulba received.

¶13   With respect to the first potential option (the fair market value of the shares in 2014), the court noted that there had been "no expert valuation on this point." The court engaged in some rhetorical analysis as to whether it could determine the fair market value from either the evidence presented at trial or from various terms within the ISOA. But the court ultimately concluded that there was "insufficient credible evidence as to the actual or fair market value of the options which would permit the court to use this component in its analysis without speculation." It thus rejected this as a metric for assessing Abu-Ulba's damages.

¶14   With respect to the second potential option (using the strike price and the repayment terms in the Promissory Note), the court concluded that these amounts provided only "weak evidence of consideration" and that it would be "speculative" to use them as the measure of damages in this case. The court noted that there was "no interest rate and no payment terms" in the Promissory Note, and it further noted that Ananda had waived the right to receive payment under the Promissory Note. "Given all of these facts and without more evidence," the court ruled that it could not "use this evidence without speculating as to value."

¶15   This left the third option, which the court ultimately accepted. In the court's view, "[a]bsent more persuasive evidence" showing that any other valuation metric should be used, the consideration that Abu-Ulba had given to Ananda for the shares of stock should be regarded as his labor and employment services. And since the evidence also suggested that

the stock options were intended to reflect Abu-Ulba's under-compensation in salary, the court thought it appropriate to use the difference between Abu-Ulba's initial monthly salary ($5,000) and the higher monthly salary that he later received ($10,000) as a "reasonable estimate" of the value of that under-compensation. Accepting this as the proper measure of damages, the court multiplied that difference ($5,000) by the number of months that Abu-Ulba had worked before his higher salary took effect (23), resulting in an assessment of damages of $115,000. As permitted by Utah Code section 61-1-22(2), the court then tripled that figure to $345,000 based on its finding that Ananda's misrepresentations were "reckless or intentional." The court also awarded Abu-Ulba interest and attorney fees.

## ISSUE AND STANDARDS OF REVIEW

¶16   Abu-Ulba now appeals the court's damages calculation. "Whether the district court applied the correct rule for measuring damages is a question of law that we review for correctness. Whether the amount awarded by the district court was supported by the evidence is a determination of fact that may be reversed on appeal only if clearly erroneous." *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 42, 516 P.3d 306 (quotation simplified).

## ANALYSIS

¶17   The district court ruled that Ananda violated the Utah Uniform Securities Act, and Ananda does not challenge that conclusion on appeal. Abu-Ulba, however, appeals the court's assessment of damages.

¶18   Under the statute, the ordinary measure of damages is "the *consideration paid for the security*, together with interest at 12% per year from the date of payment, costs, and reasonable attorney

fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." Utah Code § 61-1-22(1)(b) (emphasis added). Where a violation was "reckless or intentional," the court may award up to "three times the consideration paid for the security, together with interest, costs, and attorney fees," minus any setoff amounts. *Id*. § 61-1-22(2). As explained, the district court valued the "consideration paid for the security" in this case as being the difference in Abu-Ulba's initial salary and the higher salary that he received once the company began selling product. The court also found that Ananda's violation was reckless or intentional, so it awarded Abu-Ulba three times the amount of that consideration.

¶19 Abu-Ulba now argues that the court erred in its assessment of how to value the consideration that he paid for the shares. According to Abu-Ulba, the court should have valued that consideration as being equivalent to the strike price for the shares multiplied by the number of shares. But this argument was unpreserved.

¶20 With respect to preservation, this is the somewhat rare case in which the district court itself opined that an argument that was later made on appeal was unpreserved in the district court proceedings. After the district court ruled that Ananda was liable for violating the Utah Uniform Securities Act, the court observed that "[n]either party has suggested how the court should determine consideration paid for the securities" and that "neither party developed this evidence at trial." Thus, the district court itself said on the record that it thought that neither party (including, of course, Abu-Ulba) had given it a legal or factual basis for how to value this consideration. When the court later decided how to value that consideration, it thus did so on a theory of its own creation.

¶21    As a result, when Abu-Ulba now argues on appeal that the district court chose the wrong valuation metric, Abu-Ulba is asking for a metric that he never asked the district court to adopt. But he can't do that. After all, "when a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). To satisfy the preservation requirement, the issue must be "presented to the district court in such a way that the court has an opportunity to rule" on it, and to "provide the court with this opportunity, the issue must be specifically raised by the party asserting error, in a timely manner, and must be supported by evidence and relevant legal authority." *Id.* (quotation simplified). Because Abu-Ulba didn't provide the district court with "evidence and relevant legal authority" to support the argument that the consideration paid here was equivalent to the strike price multiplied by the number of shares, this argument is unpreserved.

¶22    After Ananda made a lack-of-preservation argument in its responsive brief, Abu-Ulba responded on three fronts. But we find none of them availing.

¶23    First, in both his reply brief and again at oral argument, Abu-Ulba provided us with a list of citations to the record where he claims that he did argue that the value of the consideration paid was $.85 per share multiplied by 550,000 shares. We've reviewed those citations, and we see no place in them where Abu-Ulba made this specific argument.

¶24    For example, Abu-Ulba points to a passage from his opposition to Ananda's motion for summary judgment, where he argued that "the value of the payment" for the 550,000 shares was the "value of the shares." But he points to no place in that opposition where he more particularly argued that the value of the consideration that he gave for the shares was equivalent to the

strike price of the shares multiplied by 550,000 (as opposed to being derived from something else, such as the shares' fair market value, or instead the value of the employment services that he provided in exchange for those stock options).

¶25    Abu-Ulba also points to the proposed findings of fact that he submitted after trial. But there, he simply argued that he was entitled to "three times the consideration paid for the shares as compensation, plus interest, costs, and attorneys' fees." As in his summary judgment opposition, he again failed to tie that value to the strike price.

¶26    Abu-Ulba next points us to his closing argument. But some of the statements made by his counsel there were actually at odds with his current argument that the consideration paid was the strike price. For example, Abu-Ulba's counsel argued that the "consideration paid" was "the value of [his] work for the company." And of note, when the court pressed Abu-Ulba's counsel for more specifics on how to value that work, Abu-Ulba's counsel did not offer an exact figure. Instead, he said that he had "no way of figuring that out," and he never told the court that it must value that labor through reference to the strike price for the shares.

¶27    In these and the other citations that Abu-Ulba has given us, it's clear that Abu-Ulba asked the court to award him damages, and he at times suggested that his damages should be tied to the value of the shares. But Abu-Ulba has pointed to no place in the record (and we see none) where he argued that, by virtue of law or fact, the court was required to assess that value through specific reference to the strike price, as opposed to something else. Given this, we agree with the district court's expressed view that Abu-Ulba did not present that court with the argument that he's now advancing on appeal. The argument was therefore unpreserved.

¶28   Second, Abu-Ulba suggests that he didn't need to preserve this argument because it's legal in nature. In support of this view, he points to *In re B.T.B.*, 2020 UT 60, ¶ 40, 472 P.3d 827, where the supreme court held that when a court is tasked with "interpreting a statute," the court "is not bound to rely only on information the parties provide." We note that in *In re B.T.B.*, the supreme court continued: "Stated differently, the parties cannot force a court into a strained interpretation of a statute by the arguments they advance. A court's duty is to get the law right and parties cannot push us off that path." *Id.*

¶29   Contrary to Abu-Ulba's suggestion, we don't regard the question presented to us by his appeal as being one of statutory interpretation. Again, in relevant part, the statute says that damages are equal to the "consideration paid for the security" in question. Utah Code § 61-1-22(1)(b). And the question Abu-Ulba has asked us to answer is whether the district court properly valued that consideration in this case.

¶30   The distinction between questions of fact and questions of law can sometimes be subtle. But in reference to that distinction, our supreme court has explained that "questions of fact are generally regarded as entailing the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind," while "legal questions, in contrast, are defined as those which are not of fact but are essentially of rules or principles uniformly applied to persons of similar qualities and status in similar circumstances." *Lysenko v. Sawaya*, 2000 UT 58, ¶ 17, 7 P.3d 783 (quotation simplified).

¶31   Here, the question raised by Abu-Ulba's appeal doesn't turn on something relating to the uniform application of this statute. Rather, it turns on what the "consideration paid" for these shares of stock was in *this case* as it related to the agreement between *these parties*. On this record, it does seem possible that the

parties thought that the dollar amount set forth in the Promissory Note (which, again, set forth a dollar amount that seemed tied to the strike price) was intended to reflect the consideration Abu-Ulba was paying—after all, Abu-Ulba received those shares in exchange for signing that note. But since the question under the statute is what consideration Abu-Ulba "paid" for those shares, and since that note was forgiven (meaning that Abu-Ulba never actually paid the amount), it also seems possible that the parties thought that Abu-Ulba was paying for these shares by providing employment services—i.e., that the shares functioned as something of an add-on to his salary.

¶32    Given these circumstances and dynamics, we thus regard the question presented to us by Abu-Ulba's appeal as being a factual question about the nature of the parties' agreement, not a legal question about how to interpret this statute. As a result, if Abu-Ulba believed that the consideration he paid for the shares was the strike price multiplied by the number of shares, it was incumbent on him to present evidence of this and then make that argument to the district court. In short, the preservation rule applies.

¶33    Finally, Abu-Ulba argues that even if the preservation rule applies, and even if he did indeed fail to present this argument to the district court, we can overlook his failure because the court ultimately ruled on it. In support of this proposition, Abu-Ulba cites *Fort Pierce Industrial Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, 379 P.3d 1218.

¶34    *Fort Pierce* turned on how to interpret some restrictive covenants from an HOA. Although neither party had argued that restrictive covenants were disfavored, the district court had nevertheless ruled that restrictive covenants "are disfavored and should be strictly construed in favor of the free and unrestricted use of property." *Id.* ¶ 9 (quotation simplified). On appeal, the supreme court held that because the district court had "directly

addressed" that question in its ruling, the affected party "had no need to take separate action in order to preserve that question." *Id*. ¶ 20 n.5. In the supreme court's view, the "district court's decision to take up the question conclusively overcame any objection that the issue was not preserved for appeal." *Id.* ¶ 13.

¶35 Relying on this decision, Abu-Ulba asserts that the district court in this case also "directly addressed (and incorrectly rejected) the value of the promissory note as the measure of consideration" and that he therefore did not need to separately preserve the argument. We disagree.

¶36 "Our preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction." *Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828. *Fort Pierce* grounded its rule in the supreme court's earlier decision in *Kell v. State*, 2012 UT 25, 285 P.3d 1133. *See Fort Pierce*, 2016 UT 28, ¶ 13. In *Kell*, the supreme court permitted an appellant to advance an issue on appeal that he had not advanced below. *See* 2012 UT 25, ¶ 11. But the court did so for essentially two reasons: first, because the *appellee* had argued the issue; and second, the district court had engaged in a "thoroughgoing analysis" of the issue and had then "rule[d] on it." *Id.* ¶¶ 10–12. In these circumstances, the supreme court held that neither of "the two primary considerations underlying the preservation rule"—fairness and judicial economy—would be served by refusing to consider the argument on appeal. *Id.* ¶¶ 11–12 (quotation simplified). And this makes sense. After all, as the supreme court explained, notions of fairness "dictate that a party should be given an opportunity to address the alleged error in the trial court," and notions of judicial economy are satisfied when the district court had the "opportunity to address the claimed error." *Id.* (quotation simplified).

¶37 In *State v. Granere*, 2024 UT App 1, 543 P.3d 177, *petition for cert. filed*, Feb. 5, 2024 (No. 20240134), we recently looked to these

same principles of fairness and judicial economy while considering another potential application of the *Fort Pierce* rule. There, even though an issue had been briefly discussed by the district court, we declined to reach it on appeal. *Id.* ¶¶ 30–31. We noted that although the appellee had referred to the issue in its submissions to the district court, the appellant had not "oppose[d]" the appellee's view of it, which thus deprived the appellee of the opportunity to "counter" the response that the appellant was advancing for the first time on appeal. *Id.* ¶ 31 (quotation simplified). Moreover, we noted that, unlike in *Kell*, the district court had not "conduct[ed] a thoroughgoing analysis of the issue," but that the court had instead chosen to "side-step[] the issue." *Id.* (quotation simplified). Because of this, we held that "judicial economy and fairness considerations weighed" against us reaching the issue on appeal. *Id.*

¶38 In light of the prudential considerations behind the preservation rule, we decline to reach the unpreserved issue here too. If Abu-Ulba believed that the consideration he paid for the 550,000 shares was reflected by the strike price associated with those shares, he had every opportunity to ask the district court to award him damages on that basis. But even when the court specifically asked Abu-Ulba's counsel during closing argument for a theory of damages, Abu-Ulba's counsel did not propose this as the valuation metric. Instead, counsel told the court that it should look to "the value of . . . the services [Abu-Ulba] provided" and that he saw "no way of figuring" out a "strict dollar number" to reflect the value of Abu-Ulba's consideration. Because of the lack of evidence and clarity in Abu-Ulba's position below, Ananda never had reason or opportunity to counter the argument that Abu-Ulba is now advancing. Notions of fairness thus caution against us reaching this issue for the first time on appeal.

¶39 Moreover, although it's true that, on its own initiative, the court considered the possibility of using the strike price as the valuation metric, the court didn't definitively "take up" the

question, *Fort Pierce*, 2016 UT 28, ¶ 13, much less "rule on it," *Kell*, 2012 UT 25, ¶ 11. Instead, the court concluded that deficiencies in the record cautioned against doing so. The court observed that because the parties had not presented "more evidence as to the value of the promissory note," it would be "speculative" for the court to now use "the strike price" from the note as the "value of the consideration." In this sense, the district court essentially side-stepped this as a potential valuation metric based on the lack of proof presented by the parties. Because of this, notions of judicial economy would be ill-served were we to now decide on appeal that this was the proper valuation for the consideration that Abu-Ulba paid for the shares. Under these circumstances, we conclude that *Fort Pierce* does not compel us to reach this otherwise unpreserved issue.

## CONCLUSION

¶40 Abu-Ulba asks us to reverse the district court's damages calculation, but he does so on the basis of an argument that he did not make to the district court and that did not provide the basis for the court's ruling. Because of this, we conclude that the argument is unpreserved. We decline to reach its merits.

¶41 Affirmed.

_____