2012 UT 65

**STATE of Utah in the interest of D.B., a person under eighteen years of age.**

**D.B., Petitioner,**

**v.**

**State of Utah, Respondent.**

**No. 20100549.**

Supreme Court of Utah.

Sept. 28, 2012.

---

55. *See supra* ¶¶ 17–19.

Wayne A. Freestone, Sandy, for petitioner.

Mark L. Shurtleff, Att'y Gen., Kenneth A. Bronston, Asst. Att'y Gen., Salt Lake City, for respondent.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 On certiorari, we must determine whether D.B., who was charged as a principal for theft and criminal trespass, received adequate Sixth Amendment notice that he may be adjudicated delinquent as an accomplice for both charges.

¶ 2 The State of Utah filed a petition that charged D.B. as a principal with theft and criminal trespass for entering a construction site and removing a pair of bolt cutters. The juvenile court adjudicated D.B. delinquent as an accomplice on both counts. The court of appeals affirmed, and we accepted D.B.'s Petition for Writ of Certiorari. We hold that D.B. received constitutionally adequate notice through trial testimony that he faced accomplice liability for theft. But D.B. did not learn he faced accomplice liability for criminal trespass until the juvenile court announced its decision adjudicating him delinquent under that theory. And D.B. may challenge the criminal trespass judgment for the first time on appeal because he had no opportunity to object before the close of evidence and no obligation to raise his objection in a postjudgment motion. Because the juvenile court adjudicated D.B. delinquent as an accomplice for criminal trespass without no-

tice, we reverse the delinquency adjudication on the criminal trespass charge, but affirm it on the theft charge.

## BACKGROUND

¶ 3 On the morning of April 14, 2008, Jason Sessions called police to report that two persons were attempting to enter a fenced construction site. Two officers were dispatched to the site and, upon arrival, found two juveniles. D.B. was outside the fence and J.M. was inside. A pair of bolt cutters lay on the ground outside the fence.

¶ 4 The State filed a petition alleging that D.B. had committed theft and criminal trespass.[1] The charges were tried in a bench trial before the juvenile court. Four witnesses testified at trial. The first, Jason Sessions, testified that he observed D.B. and J.M. as they approached the fenced construction site. According to Mr. Sessions, one juvenile climbed the fence, entered the site, and tried to break into a trailer. Mr. Sessions identified D.B. as the juvenile who entered the site. He testified that the other juvenile remained outside the fence and that he "[a]ppeared to be nervous" and acted as a "watch-out."

¶ 5 The second witness was J.M. He testified that he and D.B. climbed the fence and entered the site together. According to J.M., once they were inside, D.B. saw a pair of bolt cutters, threw them to J.M., and instructed J.M. to throw them over the fence. J.M. complied. J.M. testified that the juveniles then decided to exit the site. According to J.M., D.B. exited first and the police officers arrived before J.M. could exit.

¶ 6 The third witness was former officer Marco Mihailovich. Officer Mihailovich described that, when he arrived at the construction site, he found D.B. outside the fence and J.M. still inside of it. Officer Mihailovich also observed bolt cutters on the ground outside the fence. The fourth witness, Officer Steven Gowans, corroborated Officer Mihailovich's testimony.

---

1. The court of appeals' opinion notes that "[t]he State filed a petition alleging twelve instances of criminal conduct." *D.B. v. State (State ex rel. D.B.),* 2010 UT App 111, ¶ 3, 231 P.3d 819. The ten allegations in addition to theft and criminal trespass relate to different factual circumstances and are not relevant to this appeal.

¶ 7 After the close of evidence, the State presented a simple closing argument, rooted in principal liability. The prosecutor argued that both juveniles climbed the fence and participated in removing the bolt cutters from the site.

¶ 8 D.B.'s counsel also presented closing argument. He began by emphasizing Mr. Sessions's testimony that only one juvenile entered the site. Then he referenced the officers' testimony that, when they arrived at the site, D.B. was outside the fence and J.M. was inside of it. D.B.'s counsel argued that D.B. never entered the site and asserted that the State had failed to present evidence that D.B. was ever in possession of the bolt cutters. D.B.'s counsel referenced and then dismissed as "pure speculation" Mr. Sessions's testimony that the juvenile standing outside the fence acted as a "watch-out."

¶ 9 In rebuttal, the prosecution suggested for the first time that D.B. should be adjudicated delinquent as an accomplice. Specifically, the prosecutor adopted D.B.'s argument that he never entered the site and argued that "[n]o matter where [D.B.] was, it was clear, [Mr.] Sessions says he was a lookout." The prosecutor then contended that D.B. is "just as responsible for what his [c]odefendant does as if he committed that crime."

¶ 10 Following closing arguments, the juvenile court took the case under advisement. It announced a decision from the bench several weeks later, adjudicating D.B. delinquent as an accomplice to both theft and criminal trespass. D.B. did not object to the court's ruling or file any postjudgment motions challenging the judgment. Instead, he appealed to the Utah Court of Appeals. The court of appeals heard D.B.'s appeal and issued a split opinion, with each member of the three-judge panel writing separately. *D.B. v. State (State ex rel. D.B.)*, 2010 UT App 111, 231 P.3d 819. Judge Thorne authored the lead opinion. While he did not specifically articulate "the type of notice the [State] must give at trial," he did conclude that the trial in this case "included testimony that would support both principal and accomplice liability theories." *Id.* ¶¶ 8–9. Judge Thorne further concluded that D.B. failed to preserve his claim that he lacked adequate notice of the accomplice liability theory by objecting either during the State's closing argument, at the hearing where the juvenile court issued its decision, or through a postjudgment motion. *Id.* ¶¶ 9–10.

¶ 11 Judge Bench concurred in the result reached by Judge Thorne. He assumed, without deciding, that D.B. did not have fair notice of accomplice liability. *Id.* ¶ 13 (Bench, J., concurring). But he concluded that "absent a postjudgment motion requesting that the trial court determine whether D.B. had adequate notice of the accomplice liability theory," D.B. had failed to preserve the issue for appeal. *Id.* ¶ 17.

¶ 12 Judge Davis dissented. He criticized the lead opinion's characterization of the facts and determined that "[t]he evidence ... simply did not signal that the State was pursuing an accomplice liability theory of guilt." *Id.* ¶ 21 (Davis, J., dissenting). Because he concluded that D.B. was never on notice of the State's accomplice liability theory, Judge Davis reasoned that D.B. was under no obligation to raise an objection during closing or to object when the juvenile court issued its opinion some three weeks later. *Id.* ¶¶ 29, 32. Finally, Judge Davis argued that a postjudgment motion is not generally necessary to preserve an issue for appeal. *Id.* ¶ 36. At the end of the day, the only holding that garnered a majority in the court of appeals was that the preservation rule required D.B. to file a postjudgment motion to preserve his claim that he lacked sufficient notice of the State's accomplice liability theory. *Id.* ¶¶ 11, 17.

¶ 13 D.B. filed a Petition for Writ of Certiorari with this court. We granted the petition to consider "[w]hether a majority of the panel of the court of appeals erred in affirming the juvenile court's judgment." We have jurisdiction pursuant to sections 78A–3–102(3)(a) and 78A–3–102(5) of the Utah Code.

## STANDARD OF REVIEW

¶ 14 "On certiorari, we review [the] decision of the court of appeals for correctness. The correctness of the court of appeals' decision turns on whether that court accurately

reviewed the [juvenile] court's decision under the appropriate standard of review." *State v. Harding*, 2011 UT 78, ¶ 7, 282 P.3d 31 (citation omitted) (internal quotation marks omitted). The appropriate standard of review for the Sixth Amendment issue raised in this case is correctness. *See J.S. v. P.K. (In re I.K.)*, 2009 UT 70, ¶ 7, 220 P.3d 464.

## ANALYSIS

¶ 15 On appeal, D.B. raises a constitutional claim that he lacked adequate notice that he may be held liable as an accomplice for theft and criminal trespass. D.B.'s appeal raises the preliminary issue of whether D.B. preserved his lack of notice claim for either theft or criminal trespass. We note that the notice and preservation claims are intertwined because D.B. would have no obligation to preserve a claim of which he received no notice. We turn first to the preservation issue.

## I. D.B. MAY RAISE HIS LACK OF NOTICE CLAIM FOR CRIMINAL TRESPASS BECAUSE THAT ISSUE FIRST AROSE IN THE JUVENILE COURT'S JUDGMENT, BUT HE FAILED TO PRESERVE A SIMILAR CLAIM FOR THEFT

¶ 16 D.B. argues that the preservation rule does not apply to his claim that he lacked notice of accomplice liability for theft or criminal trespass because "there was no issue to preserve during trial" and a postjudgment motion is insufficient to preserve an alleged error for appeal. The State responds that D.B. had several opportunities to preserve his lack of notice claim during and after trial. In particular, the State claims that D.B. should have raised his notice claim either during the State's closing argument or several weeks later, when the juvenile court

rendered its decision. Additionally, the State contends that D.B. could have preserved his notice claim by filing a postjudgment motion pursuant to rule 48(a) of the Utah Rules of Juvenile Procedure.

¶ 17 Generally, "[a]n issue is preserved for appeal when it has been presented to the [juvenile] court in such a way that the court has an opportunity to rule on [it]." *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (third alteration in original) (internal quotation marks omitted). To provide the court with this opportunity, "the issue must be specifically raised [by the party asserting error], in a timely manner, and must be supported by evidence and relevant legal authority." *Donjuan v. McDermott*, 2011 UT 72, ¶ 20, 266 P.3d 839. The general preservation rule yields to two exceptions.[2] We have considered "matters not raised below under exceptional circumstances, or when plain error has occurred."[3] *Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828 (internal quotation marks omitted).

¶ 18 We must evaluate whether D.B. preserved his claim that he lacked notice that he was facing the possibility of accomplice liability for both theft and criminal trespass. To do so, we analyze whether D.B. was obligated to preserve his claim either (A) during trial, (B) during closing arguments, (C) several weeks later when the juvenile court rendered its judgment, or (D) through a postjudgment motion.

¶ 19 We hold that J.M.'s trial testimony provided D.B. with notice that he faced accomplice liability for theft, but D.B. failed to object and preserve this issue. We also hold that because D.B. did not receive notice of the potential for accomplice liability for criminal trespass until issuance of the juvenile court's judgment, he had no opportunity or obligation to object, and he may appeal the

---

**2.** In *Patterson v. Patterson*, 2011 UT 68, ¶ 13, 266 P.3d 828, we recognized a third exception to the preservation rule for "unpreserved constitutional arguments where a person's liberty is at stake." This departed from our decision in *State v. Lopez*, 886 P.2d 1105 (Utah 1994). In *Lopez*, we held that a liberty interest "is merely one factor ... to be considered when determining whether exceptional circumstances exist," and that a liberty interest does not provide an independent excep-

tion to the preservation rule. *Id.* at 1113 (internal quotation marks omitted). *Lopez* correctly states that a liberty interest may be considered as a factor under the exceptional circumstances exception.

**3.** We note that D.B. does not argue that his claim falls within an exception to the general preservation rule.

issue without first filing a postjudgment motion.

### A. During Trial, D.B. Received Notice that He Faced Accomplice Liability For Theft and Failed to Object; He Did not, However, Receive Notice that He Faced Accomplice Liability For Criminal Trespass

¶ 20 The State charged D.B. as a principal with theft and criminal trespass. D.B. may, however, have learned that he also faced accomplice liability through the presentation of evidence at trial. *Infra* ¶ 45. A person is criminally liable as an accomplice if he "act[s] with the mental state required for the commission of an offense" and "solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense." UTAH CODE § 76–2–202. We separately evaluate whether D.B. learned at trial that he faced accomplice liability for either theft or criminal trespass.

¶ 21 The theft charge against D.B. stemmed from a pair of bolt cutters found outside the construction site. At trial, J.M. testified that D.B. found a pair of bolt cutters inside the site and told J.M. "[t]hrow these over the fence." J.M. resisted at first, and D.B. told him again, "[j]ust throw them over." J.M. testified that he followed D.B.'s instructions and threw the bolt cutters over the fence. J.M.'s testimony emphasized that it was D.B.'s idea to steal the bolt cutters. And J.M.'s testimony portrays D.B. as "request[ing]," "command[ing]," or "encourag[ing]" J.M. to commit the offense of theft.[4] *See id.* J.M.'s trial testimony thus alerted D.B. that he may face accomplice liability for theft, but D.B. failed to object and preserve his lack of notice claim for appeal.

¶ 22 The State's petition charged D.B. with criminal trespass as a principal for entering the construction site. Mr. Sessions's testimony supported this theory of liability. He

stated that D.B. entered the construction site while J.M. remained outside and acted as a "watch-out." J.M.'s testimony contradicted Mr. Sessions's, but still supported a theory of principal liability inasmuch as J.M. recounted that both he and D.B. entered the construction site. Testimony of the police officers did not contradict the theory of principal liability. While the officers testified that they found D.B. outside the fence and J.M. inside it, they did not suggest that D.B. acted as an accomplice to J.M.'s criminal trespass. Indeed, the officers' testimony comports with J.M.'s testimony that D.B. was the first of the two juveniles to exit the site. In short, no evidence or testimony implicated D.B. as an accomplice for the criminal trespass charge.

¶ 23 A person is liable as a principal if he acts with the requisite mental state and "directly commits [an] offense." UTAH CODE § 76–2–202. In contrast, a person is liable as an accomplice if he "solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense." *Id.* Mr. Sessions's testimony indicates that both juveniles "directly commit[ted an] offense." His testimony is not sufficient, however, to show that the juveniles "encourage[d]" and "intentionally aid[ed]" each other. While the dissent contends otherwise, we find the dissent's theory unworkable because it would dictate that a perpetrator who commits an offense with another would necessarily be liable as both a principal and an accomplice.[5] But section 76–2–202 of the Utah Code requires conduct different from direct commission of an offense before a defendant incurs accomplice liability.

¶ 24 The juvenile court adjudicated D.B. delinquent as an accomplice for criminal trespass by discounting J.M.'s testimony as not credible and assuming that Mr. Sessions

---

4. J.M. made similar statements in a police report that D.B. obtained through a pretrial discovery request.

5. Mr. Sessions testified that both D.B. and J.M. hit the fence's padlock "with either a rock or some type of bar." Similarly, Mr. Sessions testified that both juveniles tried to climb the fence, although only D.B. ultimately entered the con-

struction site. Based on this testimony, the dissent argues that, by jointly hitting the padlock and jointly attempting to climb the fence, both D.B. and J.M. "encourage[d]" and "intentionally aid[ed]" each other in committing criminal trespass and both became liable as accomplices. *Infra* ¶ 54.

transposed J.M.'s and D.B.'s roles in the trespass. This reconciled Mr. Sessions's testimony with the officers' testimony. But a party does not have an opportunity to raise and preserve an issue if he must first speculate that the trier of fact will disbelieve a witness's actual testimony and conclude that another witness meant something entirely different from what he said. Because no evidence implicated him as an accomplice for criminal trespass, D.B. had no opportunity to preserve his claim that he lacked notice of the theory.[6]

¶ 25 In summary, D.B. had an opportunity, based on J.M.'s testimony, to object and preserve a claim that he lacked notice of accomplice liability for theft. D.B. failed to do so. He did not, however, have an opportunity to object and preserve a lack of notice claim with respect to the criminal trespass change because none of the testimony presented at trial suggested such a theory. Thus, we now consider whether D.B. was required to preserve his claim that he lacked notice of accomplice liability for criminal trespass during closing argument, when the juvenile court issued its judgment, or through a postjudgment motion.

### B. The State Did not Raise Accomplice Liability in Its Closing Rebuttal Argument

¶ 26 The State claims that its closing rebuttal argument put D.B. on notice that it was pursuing an accomplice liability theory of guilt. D.B. replies that the State's rebuttal failed to provide notice that the State intended to pursue accomplice liability in addition to principal liability. We hold that the State's vague allusion to accomplice liability in its rebuttal did not put D.B. on notice that it was pursuing accomplice liability on the criminal trespass charge.

¶ 27 When presenting its closing argument, the State offered a theory of guilt rooted in principal liability. The State recounted J.M.'s testimony that both he and D.B. entered the construction site. It then incorrectly stated that Mr. Sessions, the eyewitness, observed both D.B. and J.M. enter the construction site. In fact, Mr. Sessions had testified that only D.B. had entered the construction site.

¶ 28 D.B.'s counsel replied and offered his own interpretation of the testimony. He correctly noted that Mr. Sessions had seen only one of the juveniles enter the site. But he then argued that it was J.M., not D.B., who entered the site. To make this argument, D.B.'s counsel had to ignore both Mr. Sessions's and J.M.'s testimony that D.B. entered the construction site. D.B.'s counsel next addressed Mr. Sessions's testimony that the juvenile who remained outside the site appeared to be nervous and acted as a lookout. He argued that Mr. Sessions's testimony was "pure speculation" and that the juvenile who remained outside the fence may have been looking around and acting nervous due to discomfort with his friend's misdeeds, not because he was acting as a lookout.[7]

¶ 29 In its rebuttal, the State apologized for mischaracterizing Mr. Sessions's testimony. But instead of offering a correct statement of Mr. Sessions's testimony, the State argued "[n]o matter where [D.B.] was, it was

---

6. The dissent asserts that our opinion finds that "the juvenile court erred in assuming that Mr. Sessions transposed J.M.'s and D.B.'s roles in the trespass" and that we "chide[ ] the juvenile court judge for blindsiding D.B." *Infra* ¶ 756. The dissent mischaracterizes our opinion. We hold only that no evidence presented at trial put D.B. on notice that he may be held liable as an accomplice. Our conclusion bears no relationship to the juvenile court's later interpretation of the evidence. And we offer no opinion with respect to the juvenile court's judgment of witness credibility, reconciliation of testimony, and ultimate interpretation of the evidence.

7. D.B.'s counsel did not raise accomplice liability during his closing argument. D.B.'s counsel argued that "there just isn't any evidence that [D.B.] entered into the construction yard and had possession of any bolt cutters." He concluded that "the State has not proven its case beyond a reasonable doubt, and we ask that he be found not guilty." The dissent recognizes that D.B.'s counsel's closing argument, standing alone, did not raise accomplice liability. *Infra* ¶ 64. But the dissent argues that, in conjunction with other evidence, D.B.'s counsel's statements raised accomplice liability. *Infra* ¶ 78. We disagree. The evidence presented at trial that D.B. hit the padlock, attempted to climb the fence, and then climbed the fence and entered the site all implicate D.B. as a principal for criminal trespass, not an accomplice. *Supra* ¶¶ 23–24, 23 n. 5.

clear, [Mr.] Sessions says he was a lookout.... [Mr. Sessions] thought [D.B.] was a lookout, he was watching things, and so he's just as responsible for what his [c]o-defendant does as if he committed that crime." The State did not specify which of J.M.'s charges D.B. was "just as responsible for." And the State's rebuttal directly contradicted Mr. Sessions's and J.M.'s trial testimony that D.B. entered the construction site.

¶ 30 Because the State offered absolutely no evidence that D.B. acted as an accomplice to criminal trespass, its passing allusion in rebuttal argument to the notion that D.B. was "just as responsible for what his [c]o-defendant does as if he committed that crime" did not provide D.B. with notice that he may be held liable as an accomplice to criminal trespass. Indeed, the State's presentation of evidence had focused only on principal liability for criminal trespass. *Supra* ¶ 23. Two of the four witnesses implicated D.B. as a principal, and testimony from the remaining two witnesses was inconclusive with respect to D.B.'s role as a principal or an accomplice.[8] *Supra* ¶ 23. Based on this evidence, the State pursued a theory of principal liability in its closing argument. It was not until rebuttal that the State, based on a mischaracterization of Mr. Sessions's testimony, hinted that D.B. should be generally liable as an accomplice. And the State's hint did not even specify for which charge D.B. may have acted as an accomplice. Where the State's trial evidence and its closing argument focused on principal liability for criminal trespass, the State's hint at accomplice liability generally in its rebuttal was insufficient to put D.B. on notice that the State intended to pursue accomplice liability on the criminal trespass charge.[9] Because the State did not raise accomplice liability for criminal trespass during trial, D.B. had no opportunity to object to the theory.

¶ 31 Statements made by D.B.'s counsel at oral argument confirm that D.B. was not on notice of the State's accomplice liability theory for criminal trespass. At oral argument, D.B.'s counsel responded to a lengthy line of questioning that focused on the narrow issue of whether the State's rebuttal provided D.B. with notice of accomplice liability. In total, D.B.'s counsel responded to fifteen statements over the course of eight and one-half minutes.[10] During the colloquy, D.B.'s counsel consistently and repeatedly maintained that he did not think the State intended to raise accomplice liability generally in its rebuttal. For instance, in response to the first question, he stated, "I don't think the prosecutor himself ... meant to argue accomplice liability." Then, near the end of his opening argument, D.B.'s counsel explained "I was not absolutely sure ... the prosecutor was arguing [accomplice liability]." And again, on rebuttal, he affirmed that "I was not absolutely sure that [the prosecutor] was going to argue or was arguing accomplice liability."[11] D.B.'s counsel's comments do not

---

8. The police officers testified that, when they arrived, they found D.B. outside of the construction site and J.M. inside of it. The testimony does not suggest whether D.B. did, or did not, enter the site.

9. Because there was some evidence to support a theory of accomplice liability on the theft charge, the State's general reference to accomplice liability in rebuttal would reasonably be interpreted as a reference to accomplice liability for theft—not criminal trespass.

10. The questioning spanned D.B.'s opening argument and rebuttal. We refer to it as a single colloquy for simplicity.

11. Near the end of the questioning, D.B.'s counsel acquiesced in the suggestion that he made a strategic choice not to raise accomplice liability by objecting during the State's closing rebuttal argument. D.B.'s counsel explained that he did not want to raise the accomplice liability theory by objecting because he thought the State was pursuing principal liability and *had not raised accomplice liability.* D.B.'s counsel's statement in no way indicated that he knew the State had raised accomplice liability and that he consciously avoided making an objection to the theory. To draw such a conclusion would ignore his repeated statements that he believed the State was not pursuing accomplice liability.

The dissent claims that we excuse D.B.'s counsel's decision not to object at closing argument because we find that he misunderstood the State's closing rebuttal. *Infra* ¶ 72 n. 5. This misstates our opinion. We hold that, because the evidence presented at trial implicated D.B. as a principal, the State's general hint at accomplice liability in its closing rebuttal was insufficient to raise accomplice liability. D.B.'s counsel's statements at oral argument indicating that he did not think the State had raised accomplice liability comport with this interpretation. Thus,

suggest that he knew the State was pursuing accomplice liability on the criminal trespass charge.

¶ 32 We thus hold that the State's vague and general allusion to accomplice liability in its rebuttal did not put D.B. on notice that the State was seeking to hold him liable as an accomplice on the criminal trespass charge. Statements made by D.B.'s counsel at oral argument confirm this. Therefore, D.B. did not need to preserve the issue for appeal.

### C. D.B. Had no Obligation to Object and Preserve His Lack of Notice Claim When the Juvenile Court Issued Its Judgment

■ ¶ 33 The State alternatively argues that D.B. had an obligation to object when the juvenile court issued its judgment adjudicating him delinquent as an accomplice on the criminal trespass charge. We disagree. Because accomplice liability arose for the first time in the juvenile court's judgment, D.B. had no obligation to object that he lacked notice of accomplice liability for criminal trespass to preserve that issue for appeal.

■ ¶ 34 Generally, we "will not consider an issue unless it has been preserved for appeal." *Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. The general preservation rule

"does not apply, however, when the alleged error first arises in the lower court's final order or judgment and thus, leaves no opportunity for the party to object below or to bring issues to the attention of the trial court." [12] *Albores v. Bracamontes*, 2006 UT App 204, ¶ 4, 138 P.3d 106; *id.* ¶¶ 6, 10 (considering the merits of petitioner's standing arguments, which were raised for the first time on appeal, because the district court sua sponte raised standing in its judgment and petitioner "did not have the opportunity to object"); *see also Delatore v. Delatore*, 680 P.2d 27, 29 (Utah 1984) (reaching the merits of appellant's attorney fees argument because respondent did not provide a proper evidentiary basis for the award, the trial court made the award in its final ruling, and "[t]he trial was then over and there was no opportunity for the defendant to object"); *Shields v. Harris*, 934 P.2d 653, 656 n. 1 (Utah Ct.App.1997) (addressing appellant's unpreserved arguments about the duration of an option contract because the term used by the trial court first appeared in the judgment and appellant "had no opportunity to object in the ordinary course of events"); 4 C.J.S. *Appeal and Error* § 297 (2012) ("The rule that questions should be raised at the first opportunity, and that contentions must be

---

we conclude that D.B.'s counsel properly understood the State's closing rebuttal.

Even if we assume that D.B.'s counsel knew the State intended to raise accomplice liability and that he made a strategic choice not to object, we would still conclude that D.B.'s counsel did not have an opportunity to preserve his lack of notice objection to the accomplice liability theory on the criminal trespass charge because the oral argument questions focused on accomplice liability generally and did not differentiate between theft and criminal trespass. Indeed, all of the proceedings, including the parties' closing arguments, the judgment, the court of appeals' decision, and the parties' briefing to this court, discuss accomplice liability for theft and criminal trespass together or accomplice liability generally. The dissent identifies two isolated instances that discuss accomplice liability for criminal trespass specifically. But these examples do not upset our conclusion that the proceedings as a whole, including the questions at oral argument, addressed accomplice liability only generally. Moreover, at the time of closing argument, the only evidence presented that implicated D.B. as an accomplice related to the charge of theft, *supra* ¶ 22; no evidence implicated him as an

accomplice for criminal trespass, *supra*, ¶¶ 22–24. Thus, if D.B.'s counsel did concede that he made a strategic choice not to object to accomplice liability generally, it is unclear that he intended the concession to extend to accomplice liability for criminal trespass. And we decline to hold that D.B.'s counsel conceded a point that was not directly raised during oral argument.

12. The State cites to *D.M. v. State (State ex rel. D.M.)*, 2006 UT App 319U, 2006 WL 2089962 (per curiam), in support of its argument that the preservation rule required D.B. to object if he considered the legal ground of the juvenile court's judgment "unfounded or a surprise." The State's position is simply not supported by *D.M.* In *D.M.*, a juvenile claimed that the court violated his state and federal constitutional rights by not permitting cross examination of his probation officer. *Id.* The court of appeals held that *D.M.* did not ask to cross examine the probation officer or respond to the officer's allegations and, therefore, the juvenile did not preserve his constitutional claims. *Id. D.M.* did not, however, create an obligation to object to a juvenile court's judgment as a prerequisite to challenging it on appeal.

raised below in order to be available on appeal, does not apply where the question did not exist or could not be raised below.").

¶ 35 Here, D.B. received no notice that the State intended to pursue an accomplice liability theory for criminal trespass during trial or closing arguments. *Supra* ¶¶ 23–24, 32. Instead, D.B. first became aware of the accomplice liability theory on his criminal trespass charge when the trial court issued its judgment several weeks later and adjudicated him delinquent as an accomplice for both theft and criminal trespass. Because D.B. learned of accomplice liability for the criminal trespass charge for the first time in the juvenile court's judgment, he had no opportunity to object to the theory. Moreover, he had no obligation to preserve his lack of notice claim, and he may raise the claim for the first time on appeal.

D. *D.B. Did not Need to File a Postjudgment Motion to Preserve His Lack of Notice Claim Because He Became Entitled to an Appeal as of Right When the Juvenile Court Issued Its Final Judgment*

¶ 36 D.B. asks that we review his lack of notice claim even though he did not file a postjudgment motion raising the claim. He reasons that a postjudgment motion is neither necessary nor sufficient to preserve an issue for appeal. The State disagrees, arguing rule 48(a) of the Utah Rules of Juvenile Procedure permits D.B. to move for a new hearing pursuant to rules 52, 59, and 60 of the Utah Rules of Civil Procedure. The State asserts that, because D.B. could file a postjudgment motion, such as a motion for new trial, he had an obligation to file such a motion to preserve his claim for appeal. We hold that D.B. did not need to file a postjudgment motion as a prerequisite to filing his appeal. Rather, D.B. became entitled to appeal when the juvenile court issued its final judgment adjudicating him delinquent as an accomplice to criminal trespass.

¶ 37 Rule 52 of the Utah Rules of Juvenile Procedure provides that, "[e]xcept as other-

wise provided by law, an appeal may be taken from the juvenile court to the Court of Appeals from a final judgment, order, or decree by filing a Notice of Appeal ... within 30 days after the entry of the judgment, order, or decree appealed from." UTAH R. JUV. P. 52(a). Similarly, rule 3 of the Utah Rules of Appellate Procedure provides that a party is entitled to an appeal as of right from "all final orders and judgments" of the juvenile court "by filing a notice of appeal with the clerk of the [juvenile] court within the time allowed by Rule 4 [of the Utah Rules of Appellate Procedure]." UTAH R.APP. P. 3(a). Rule 4 provides that, "[i]n a case in which an appeal is permitted as a matter of right[,] ... the notice of appeal ... shall be filed with the clerk of the [juvenile] court within 30 days after the date of entry of the judgment or order appealed from." *Id.* 4(a). Rule 4 articulates several circumstances that extend the time allowed for filing a notice of appeal. *Id.* 4(b)(1). For instance, the thirty-day period may be extended by filing a motion for new trial pursuant to rule 59 of the Utah Rules of Civil Procedure. *Id.* 4(b)(1)(D). While a party may extend the time for filing a notice of appeal with rule 4, doing so does not affect the party's right to appeal the underlying judgment. *See id.* 4(b)(2) ("A notice of appeal filed after announcement or entry of judgment, but before entry of an order disposing of any motion listed in Rule 4(b) ... *is effective to appeal only from the underlying judgment.*" (emphasis added)).[13]

¶ 38 In short, to file an appeal as of right, a party must complete two independent steps. First, a party must become entitled to appeal. A party may become entitled to an appeal under several circumstances, including when a juvenile court issues a final judgment. Second, a party must perfect its entitlement to appeal by filing a timely notice of appeal. While the time to complete step two may be extended by filing an elective postjudgment motion, the mere availability of postjudgment motions neither divests a party of its entitlement to appeal under step one,

---

**13.** If a party files a notice of appeal prior to filing a rule 4(b) motion and wants to appeal the final order disposing of the motion, he must amend his notice of appeal to do so. UTAH R.APP. P. 4(b)(2).

nor makes the motions a prerequisite to filing an appeal.

¶ 39 Here, the juvenile court adjudicated D.B. delinquent as an accomplice for criminal trespass. The court's judgment provided D.B. with an entitlement to an appeal as of right. D.B. may permissibly raise his lack of notice claim on appeal, without preserving it because the trial court raised accomplice liability for criminal trespass for the first time in its judgment and D.B. had no prior opportunity to object. *Supra* ¶ 34. To perfect his entitlement to appeal, D.B. only needed to file a timely notice of appeal, and he did so on September 25, 2008. The State fails to identify an exception "otherwise provided by law" that would prevent D.B. from exercising his entitlement. Thus, while D.B. could have tolled the time for filing a notice of appeal by submitting an elective postjudgment motion, he was not required to do so.[14] And even if D.B. had filed a postjudgment motion, doing so would not have affected his entitlement to appeal the underlying judgment.

¶ 40 In summary, the juvenile court adjudicated D.B. delinquent as an accomplice for theft and criminal trespass. D.B. learned of the accomplice liability theory on the theft charge through J.M.'s trial testimony, but he failed to raise an objection and preserve for appeal his claim that he lacked notice of the theory. D.B. did not, however, receive notice either at trial, or through the State's vague comment in rebuttal argument, that he may be held liable as an accomplice on the criminal trespass charge. Instead, D.B. learned of the theory for the first time when the juvenile court adjudicated him delinquent as an accomplice for criminal trespass. He therefore had no obligation to object to the judgment to preserve his claim that he lacked notice of accomplice liability for criminal trespass. Upon entry of judgment, D.B. became entitled to an appeal as of right and he did not need to file an elective postjudgment motion as a prerequisite to his appeal. We now turn to the merits of D.B.'s claim that he lacked constitutionally adequate notice that the State was seeking to hold him liable as an accomplice for criminal trespass.

## II. D.B. DID NOT RECEIVE CONSTITUTIONALLY ADEQUATE NOTICE THAT HE MAY BE LIABLE AS AN ACCOMPLICE TO CRIMINAL TRESPASS PRIOR TO THE CLOSE OF EVIDENCE

¶ 41 D.B. argues that he lacked adequate notice of the State's accomplice liability theory because "the State did not present or pursue an accomplice liability theory during the presentation of the evidence and did not even address it in opening or closing arguments." The State argues that principal and accomplice liability do not represent separate offenses and that its petition alleging principal liability provided D.B. with adequate notice, standing alone, of the potential that he could be adjudicated delinquent under a theory of accomplice liability. The State also argues, in the alternative, that D.B. received

---

**14.** D.B. cites two lines of cases to support his position that a postjudgment motion is neither necessary nor sufficient to preserve an issue for appeal. But neither line of cases addresses the precise question presented today: Whether a postjudgment motion is necessary to preserve an issue that did not arise during trial. Instead, the first line of cases holds that a postjudgment motion is superfluous and unnecessary to preserve an issue that was previously raised. *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 23, 215 P.3d 152 (holding that a motion for directed verdict was not a prerequisite to filing an appeal where the district court ruled on the legal issue to be appealed at summary judgment); *Sittner v. Schriever*, 2000 UT 45, ¶¶ 16–17, 2 P.3d 442 (holding that the preservation rule "does not require a party to file a post-judgment motion before the trial court as a prerequisite to filing an appeal" when the party has already raised the issue in motions and pleadings below). And the second line of cases holds that a postjudgment motion cannot resurrect an issue that could have been, but was not, properly preserved before the trial court. *See State v. Erickson*, 722 P.2d 756, 759 (Utah 1986) (holding that a postjudgment motion will not preserve an issue for appeal where an appellant had an opportunity, but failed, to preserve an issue during pretrial or trial proceedings); *Barson ex rel. Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 837–38 (Utah 1984) (same); *Beehive Med. Elecs., Inc. v. Square D Co.*, 669 P.2d 859, 861 (Utah 1983) (same); *Hart v. Salt Lake Cnty. Comm'n.*, 945 P.2d 125, 130 n. 1 (Utah Ct.App.1997) (same); *Estate of Covington ex rel. Covington v. Josephson*, 888 P.2d 675, 678–79 (Utah Ct.App.1994) (same); *LeBaron & Assocs., Inc. v. Rebel Enters., Inc.*, 823 P.2d 479, 483–84 (Utah Ct.App.1991) (same).

adequate notice of its accomplice liability theory through inferences from trial testimony and the State's closing rebuttal argument. We hold that D.B. did not receive constitutionally adequate notice of accomplice liability for criminal trespass prior to the close of evidence.

¶ 42 The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." [15] The purpose of the Sixth Amendment's guarantee is to provide criminal defendants with the information necessary to "permit adequate preparation of a defense." *Stephens v. Borg*, 59 F.3d 932, 934 (9th Cir.1995); *see also State v. Fulton*, 742 P.2d 1208, 1214–15 (Utah 1987).

¶ 43 This case requires us to determine when a defendant charged as a principal has received adequate Sixth Amendment notice that he may be adjudicated delinquent as an accomplice. A person acts as an accomplice if he has "the mental state required for the commission of an offense" and "solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense." UTAH CODE § 76–2–202. "It is well settled that accomplices incur the same liability as principals." *State v. Gonzales*, 2002 UT App 256, ¶ 12, 56 P.3d 969. As a result, "a person charged with a crime [as a principal] has adequate notice of the *possibility* of accomplice liability being raised at trial." *Id.* (emphasis added). But the question of what notice is constitutionally sufficient before the State may *actually* pursue accomplice liability is an issue of first impression for this court.

¶ 44 We find persuasive the rule adopted in *Stephens*, 59 F.3d at 934–35 and *Commonwealth v. Harper*, 442 Pa.Super. 553, 660 A.2d 596, 599 (Pa.Super.Ct.1995). Those courts held that the Sixth Amendment is satisfied when a defendant (1) receives adequate notice that the State is pursuing accomplice liability and (2) the State has not affirmatively misled the defendant.[16] *Harper*, 660 A.2d at 599–600; *see also Stephens*, 59 F.3d at 934–35.

¶ 45 Charging an individual as a principal, standing alone, does not provide adequate notice that the State is actually pursuing an accomplice liability theory. But a defendant may receive constitutionally adequate notice that he is facing accomplice liability in several ways. The simplest way for the State to provide adequate notice is by actually charging the defendant as an accomplice. The state may also notify a defendant of potential accomplice liability through presentation of adequate evidence at any time prior to the close of evidence at trial.[17] *State v. Mancine*, 124 N.J. 232, 590 A.2d 1107, 1120 (1991) (holding that defendant "must have learned of the possibility of a hired-gunman theory through pretrial discovery ... [or] his own testimony" (citations omitted)); *Commonwealth v. Smith*, 334 Pa.Super. 145, 482 A.2d 1124, 1127 (1984) (holding that defendant could be found guilty as an accomplice because he was initially scheduled to be tried jointly and he repeatedly "at-

---

15. The court of appeals discussed D.B.'s notice claim in general terms under the Due Process Clause. *D.B. v. State (State ex rel. D.B.)*, 2010 UT App 111, ¶ 12, 231 P.3d 819. Before this court, the parties base their notice arguments on the Sixth Amendment. The Sixth Amendment is incorporated in the Due Process Clause and applies to state criminal courts. *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (holding that the Sixth Amendment right to be "informed of the nature and cause of the accusation .... [is] part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States" (internal quotation marks omitted)). Because the Sixth Amendment is incorporated into the Due Process Clause and relates directly to the notice that must be provided to criminal defendants, we focus our discussion on that amendment.

16. The State affirmatively misleads a defendant if it expressly rejects a theory of accomplice liability, but later pursues the theory. *See, e.g., Commonwealth v. McDuffie*, 319 Pa.Super. 509, 466 A.2d 660, 662 (1983). There is no allegation here that the State affirmatively misled D.B.

17. We evaluate the adequacy of notice with a "generalized weighing of the completeness of the notice and its adequacy for the defendant's purposes against the background of the information legitimately available to the prosecuting authority." *State v. Wilcox,*. 808 P.2d 1028, 1032 (Utah 1991).

tempted to transfer criminal responsibility to [his codefendant]" during trial).[18] However, development of an accomplice liability theory *after* the close of evidence eliminates a defendant's ability to prepare his defense and present evidence relating to the accomplice liability theory.[19] It therefore fails to provide constitutionally adequate notice.[20]

¶ 46 Here, the State charged D.B. as a principal with criminal trespass for entering the construction site. At trial, the testimony of both Mr. Sessions, the eyewitness, and J.M. supported principal liability. *Supra* ¶ 22. Testimony of the two police officers, the only other trial witnesses, did not suggest whether D.B. acted as a principal or an accomplice. *Supra* ¶ 22. In short, no evidence or testimony presented at trial implicated D.B. as an accomplice to criminal trespass.

¶ 47 The juvenile court nevertheless adjudicated D.B. delinquent as an accomplice for criminal trespass. It did so by discounting J.M.'s testimony as not credible and assuming that Mr. Sessions transposed J.M.'s and D.B.'s roles in the trespass. This reconciled Mr. Sessions's testimony with the officers' testimony that they found D.B. outside the site and J.M. inside of it. But a defendant does not receive constitutionally adequate notice if he must assume that the finder of fact

will disbelieve witness testimony and speculate that the witness actually intended to testify to facts that would support a charge of accomplice liability.

■ ¶ 48 The State also argues that D.B. received notice of accomplice liability for criminal trespass through its closing rebuttal argument. But notice provided after the close of evidence is not constitutionally sufficient. Moreover, we have already concluded that the State's passing allusion in its rebuttal did not notify D.B. that he faced accomplice liability for criminal trespass. *Supra* ¶ 32. Because D.B. did not receive constitutionally adequate notice that he may face accomplice liability for criminal trespass prior to the close of evidence, the juvenile court erred when it adjudicated him delinquent under that theory.

## CONCLUSION

¶ 49 The Sixth Amendment requires the State to provide a defendant charged as a principal with adequate notice if the State also plans to pursue an accomplice liability theory. To do so, the State must either charge the defendant as an accomplice or present evidence of accomplice liability prior to the close of evidence at trial. Here, D.B. received notice of the accomplice liability theory on the theft charge through trial testimo-

---

18. *See also Calderon v. Prunty*, 59 F.3d 1005, 1010 (9th Cir.1995) (holding that defendant "received notice of the lying in wait theory [of first degree murder] during the prosecutor's opening statement, the evidence introduced, and the trial court's description of the crime scene," all of which occurred before defendant testified); *Stephens*, 59 F.3d at 936 (holding that defendant received adequate notice of a felony-murder theory of first degree murder because he received the State's requested jury instructions during his case-in-chief and the State presented "substantial evidence of burglary at trial" (internal quotation marks omitted)); *Morrison v. Estelle*, 981 F.2d 425, 428 (9th Cir.1992); *Sheppard v. Rees*, 909 F.2d 1234, 1235, 1237 (9th Cir.1990) (acknowledging that defendant was denied adequate notice where the State did not present its felony-murder theory of first degree murder "during pretrial proceedings, opening statements, or the taking of testimony").

19. The dissent asserts that our opinion adopts a blanket rule prohibiting the prosecution from raising accomplice liability explicitly for the first time in closing. *Infra* ¶ 80–81. The dissent misreads our opinion. The State may explicitly

raise accomplice liability for the first time in its closing argument if it has presented adequate evidence of accomplice liability prior to the close of evidence. Here, the State failed to present evidence that would notify D.B. that he needed to prepare a defense to accomplice liability prior to the close of evidence and, as a result, the State could not raise the theory for the first time in closing argument.

20. D.B. raises a third issue on appeal, claiming that the juvenile court "did not have authority to amend the charging document to include accomplice liability on its own motion." But D.B. incorrectly assumes that the juvenile court could only adjudicate him delinquent as an accomplice by amending the State's petition. As we have articulated, the State's petition charging D.B. as a principal put D.B. on notice of the *possibility* of accomplice liability. *Supra* ¶ 43. D.B. could then be adjudicated delinquent as an accomplice so long as the evidence presented at trial provided notice of the potential for accomplice liability. *Supra* ¶ 45.

ny. He failed, however, to object to the accomplice liability theory and thus did not preserve his claim for appeal. In contrast, D.B. did not receive notice that the State was pursuing accomplice liability for the criminal trespass charge prior to the close of evidence. As a result, the juvenile court erred when it adjudicated D.B. delinquent for criminal trespass and D.B. was under no obligation to preserve the issue in the juvenile court where the accomplice liability theory first appeared in the court's judgment. Accordingly, we affirm the juvenile court's judgment adjudicating D.B. delinquent as an accomplice to theft, but we reverse the judgment adjudicating him delinquent as an accomplice to criminal trespass and remand for a new trial on that issue.

Justice LEE filed a dissenting opinion, in which Chief Justice DURRANT joined.

Justice LEE, dissenting, in which Chief Justice DURRANT concurred:

¶ 50 The majority in this case reverses a juvenile court conviction on accomplice liability for trespass. It does so on the ground that the prosecution failed to give sufficient notice of its intent to pursue accomplice liability at trial. I respectfully dissent on two grounds: (1) the defense had multiple opportunities to preserve an objection to the accomplice liability theory but made a strategic decision not to raise it; and (2) in any event the notice rendered in this case was constitutionally adequate.

## I

¶ 51 The majority acknowledges that D.B. failed to preserve an objection to the theory of accomplice liability adopted by the juvenile court, but excuses that failure on the ground that he purportedly had no notice of that theory until the court rendered its judgment. *Supra* ¶ 35. That conclusion is thoroughly belied by the record. There are at least three grounds in the record for finding that D.B. had reasonable notice of the possibility of accomplice liability: (a) eyewitness testimony, which indicated that both D.B. and his coconspirator (J.M.) beat on the padlock on the gate in the course of the trespass, and also that one of them served as a lookout

while the other was trespassing; (b) the closing arguments at trial, in which D.B.'s counsel himself suggested that D.B. was the one on lookout duty and the prosecution responded by asserting that in that event D.B. would be liable as an accomplice; and (c) the oral argument on appeal, where D.B.'s counsel openly conceded that he made a calculated, strategic decision at trial *not* to object to the accomplice liability theory because he thought an objection could only highlight the theory and increase the chance of a conviction.

## A

¶ 52 The majority asserts that "no evidence or testimony" presented at trial "implicated D.B. as an accomplice for the criminal trespass charge." *Supra* ¶ 22. That is incorrect. It is true that eyewitness Jason Sessions identified D.B. (and not J.M.) as the one who entered the construction site. *Supra* ¶ 22. But that was not the entirety of the evidence at trial of relevance to D.B.'s role in the trespass. And when viewed in context of the full evidentiary picture, there is no doubt that Sessions's testimony provided ample notice that D.B. was on the hook for accomplice liability.

¶ 53 First, the majority ignores Sessions's testimony regarding both juveniles' actions prior to one of them hopping the fence. Initially, Sessions testified that he saw both D.B. and J.M. approach the fence surrounding the construction area and begin to simultaneously "bang" on the gate's padlock with a rock or bar for "approximately two minutes." When this effort yielded no entry, Sessions stated that he saw both boys start climbing the fence. Although he also indicated that only one of them succeeded in scaling the fence (and later suggested that was D.B.), both boys' conduct up to that point clearly encompassed the sort of classic aiding and abetting that would qualify for accomplice liability.

¶ 54 As the majority notes, an individual is liable as an accomplice if he acts with the requisite mental state and "solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which

constitutes an offense." *Supra* ¶ 20 (quoting Utah Code § 76-2-202). Whether D.B. successfully hopped the fence or not, Sessions's testimony makes clear that *both* juveniles engaged in conduct amounting to encouraging and aiding the joint enterprise of trespass—in banging on the padlock and scaling the fence together. While the padlock-banging and fence-scaling were trespasses in their own right,[1] D.B.'s padlock-banging and fence-scaling also "encourage[d]" or "intentionally aid[ed]" J.M. in circumventing the fence. So the acts Sessions testified to unquestionably opened the door to liability for each of them for aiding the other in criminally trespassing.[2]

¶ 55 Second, although Sessions testified that he saw only one of the two juveniles succeed in scaling the fence, he also stated that he saw the other lingering nearby, just "looking around . . . communicating back and forth to [the other juvenile]." The one who stayed behind, according to Sessions, then served as a lookout for the one who climbed over the fence. These are likewise classic acts of aiding and abetting.[3] They surely put D.B. on notice that the juvenile who stayed behind "communicating back and forth" and acting as a lookout was in jeopardy of conviction as an accomplice for trespass.

¶ 56 The majority dismisses this second strand of evidence on the ground that Sessions identified D.B. as the one who scaled the fence—a point that the court sees as foreclosing any inference or argument that

D.B. was the lookout. According to the majority, the juvenile court erred in "assuming that Mr. Sessions transposed J.M.'s and D.B.'s roles in the trespass." *Supra* ¶¶ 24, 47. And it chides the juvenile court judge for blindsiding D.B.—for entering a judgment resting on a theory requiring D.B. to "speculate that the trier of fact will disbelieve a witness's actual testimony and conclude that another witness meant something entirely different." *Supra* ¶ 24; *see also supra* ¶ 47.

¶ 57 That concern seems valid enough as an abstract proposition. But it is not at all implicated in the actual circumstances of this case. Here there was no blindside for the defendant because there was other evidence in the record of his participation as an accomplice (banging on the lock and scaling the fence). And even with respect to the question whether it was D.B. or J.M. who stayed behind as lookout, there was nothing particularly troubling (or surprising or unfair) about the trial court's resolution of the testimony.

¶ 58 D.B. was surely on notice of testimony that he acted in concert with J.M., that both attempted to enter the construction area, and that there was some discrepancy as to whether it was D.B. or J.M. who actually scaled the fence. Granted, Sessions ultimately identified J.M. as the one who stayed behind as lookout. But that is of little consequence given Sessions's concession on the stand that he only saw the juveniles' "facial features from a distance" and given that he never

---

1. *See* Utah Code § 76-6-206(2)(a)(i) ("A person is guilty of criminal trespass if . . . the person enters or remains on property and . . . intends to cause . . . damage to any property[.]"); *id.* § 76-6-206(2)(b)(ii) ("A person is guilty of criminal trespass if . . . knowing the person's entry or presence is unlawful, the person enters or remains on property as to which notice against entering is given by . . . fencing or other enclosure obviously designed to exclude intruders[.]").

2. Sometimes "a perpetrator who commits an offense with another would . . . be liable as both a principal and an accomplice." *See supra* ¶ 23. But that certainly would not be true in every case. And I see nothing unworkable in the straightforward idea that the facts of each case will establish whether a defendant's commission of a crime also facilitates a partner-in-crime's ability to commit the same crime at the same time.

3. *See State v. Johnson,* 6 Utah 2d 29, 305 P.2d 488, 489 (1956) (concluding that it was reasonable for a trial court "to infer that [the defendant] . . . was acting as a lookout for [the codefendant] and was aiding and abetting him in the burglary," and citing Utah Code § 76-1-44 (1953) for the proposition that "anyone who aids or abets or advises and encourages the commission of a crime is a principal in such crime"); *see also State v. Scott,* 111 Utah 9, 175 P.2d 1016, 1020 (1947) (noting that "if the proof supports a conclusion that [a defendant] was acting as a 'lookout' or 'get-away man', he was aiding in the commission of the offense"); *Am. Fork City v. Rothe,* 2000 UT App 277, ¶¶ 9-10, 12 P.3d 108 (affirming a trial court's determination that a defendant aided in the commission of a theft "by acting as a lookout").

identified either of the youths to police officers. In these circumstances, the juvenile court's interpretation of the evidence was more than reasonable and could hardly have taken D.B. by surprise.

¶ 59 Indeed, as elaborated below, *infra* ¶¶ 62–65, the juvenile court's resolution of the testimony (accepting Sessions's testimony generally but concluding that he transposed the identities of D.B. and J.M.) was more than just unsurprising to D.B.: It was an acceptance of D.B.'s *own theory* proffered in closing argument. Thus, Sessions's "lookout" testimony was hardly a blindside for D.B. as a basis for conviction as a trespass accomplice. It was a natural, straightforward basis for resolving the testimony at trial and was in fact the very basis that D.B. himself put forward when it appeared to suit him.

¶ 60 That conclusion is not at all undermined by the fact that D.B. was charged only as a principal and not an accomplice. *See supra* ¶ 22. Criminal charging documents rarely distinguish between principal and accomplice liability, nor are they required to do so. *See* UTAH CODE § 76-2-202; *see also State v. Gonzales*, 2002 UT App 256, ¶ 12, 56 P.3d 969 ("It is well settled that accomplices incur the same liability as principals. Thus, a person charged with a crime has adequate notice of the possibility of accomplice liability being raised at trial because conviction of accomplice and principal liability do not require proof of different elements or proof of different quality." (citations omitted)). Where (as here) the incident in question involves two coconspirators, both should come to trial anticipating the possibility of either primary or secondary liability. And where the evidence and argument presented suggest both principal criminal conduct and acts of aiding and abetting, the lack of a formal accomplice charge is utterly irrelevant.

¶ 61 Thus, I would conclude that the evidence at trial amply suggested and supported the imposition of accomplice liability for D.B. for trespass. D.B. cannot credibly claim that he was blindsided by the imposition of such liability, and his failure to object thus bars him from complaining on appeal.

B

¶ 62 If there was ever any doubt about the accomplice liability theory at trial, it was resolved completely during closing argument. The majority insists that it was not until rebuttal that "based on a mischaracterization of Mr. Sessions's testimony," the State "hinted that D.B. should be generally liable as an accomplice." *Supra* ¶ 30. But this is not at all how closing argument transpired.

¶ 63 As the majority notes, the State initially portrayed Sessions's testimony as indicating that both D.B. and J.M. entered the construction area. But to end the narrative there, as the majority does, disregards the defense's closing. In his response to the State's closing, defense counsel pounced on the mischaracterization, stating that "[c]ontrary to the closing statement of the State, Jason Sessions was very clear that only one individual crossed the fence." Defense counsel went on to emphasize that "the other individual stayed outside" and that "when the police officers actually arrived, one of the individuals was not in the construction yard. That was, in fact, [D.B.]." D.B.'s counsel then observed that, of all the witnesses, only J.M. stated that D.B. went over the fence into the construction area. Counsel then countered that assertion, citing Sessions who "sa[id] that [D.B.] did not; and we have the police officers who corroborate that when they arrived ... he was, in fact, outside of the construction area." Winding up to drive his point home, defense counsel offered this conclusion: "The fact is, [D.B.] never did go into the construction yard, and consequently, there was no criminal trespass on his behalf."

¶ 64 Defense counsel likely hoped this would be his home-run acquittal argument—establishing once and for all that his client did not scale the fence or touch the stolen bolt cutters. But this tack neatly cued up the accomplice liability theory. By insisting that his client never entered the construction area but instead stayed outside the fence while his coconspirator entered and attempted to steal the bolt cutters, defense counsel set up an inevitable dichotomy—casting D.B. as either an accomplice or an innocent by-

stander, but not a principal. And given the eyewitness testimony that both juveniles attempted to enter the site and one loitered just outside the fence when his partner succeeded in gaining entry, D.B.'s counsel unequivocally (and quite strategically) opened the door to accomplice liability.

¶ 65 Thus, the State's follow-up on rebuttal was not some "passing allusion ... to the notion" of accomplice liability, as the majority insists. *Supra* ¶ 30. It was a direct response to the framework constructed by the defense. In his rebuttal, the prosecutor apologized for potentially "misinform[ing]" the court in suggesting that Sessions had said that both juveniles climbed the fence, conceding his mistake and acknowledging that Sessions had said that one juvenile climbed over the fence and the other stayed behind as a lookout. Having done so, however, the prosecutor then made a clear—and completely natural—response to D.B.'s counsel's suggestion that it was D.B. who stayed behind: He argued that even under that framework D.B. was liable as an accomplice—that in that event D.B. "was a lookout, he was watching things, and so he's just as responsible for what his Co-defendant does as if he committed that crime."

¶ 66 This was no "hint[ ] that D.B. should be generally liable as an accomplice," or "vague and general allusion to accomplice liability." *Supra* ¶¶ 30, 32. It was an unequivocal demand that the court find D.B. guilty as an accomplice under the defense's own portrayal of the evidence. Thus, at closing if not before, it was obvious to D.B. that he was on the hook as an accomplice to trespass. He thus had an obligation to object at that point if he wanted to preserve his right to challenge the propriety of that theory on appeal. His failure to do so is fatal here.

C

¶ 67 The final nail in the preservation coffin is an interchange that took place at oral argument on appeal to this court. That interchange not only confirmed that D.B.'s counsel was aware that his client was in jeopardy of conviction for trespass on accomplice liability. It actually revealed that the failure to

object to this theory was a conscious, strategic decision by trial counsel. We cannot properly address matters on appeal that were strategically waived at trial, as this issue was.

¶ 68 When pressed by our court at oral argument, D.B.'s counsel openly admitted that he made a strategic choice to "remain silent" when the State emphasized its accomplice liability theory during closing argument. The majority's contrary conclusion, *supra* ¶ 31, rests on selective quotes from the oral argument—from counsel's initial equivocation and attempted denial of the court's suggestion of waiver. But the cited equivocation was completely cleared up in subsequent answers to the court's questions, when counsel candidly conceded not just notice of accomplice liability but strategic waiver.

¶ 69 Specifically, counsel conceded that, instead of objecting to the prosecutor's closing rebuttal, he strategically opted to remain silent, noting that "[i]f I remained silent, I thought there was a huge chance that [D.B.] would be acquitted because there was not enough evidence to convict him." In a commendable point of candor, moreover, counsel also acknowledged that his failure to object was rooted in the concern that objecting "would have waved a red flag and said, here, prosecute my client for accomplice liability." And finally, when pressed about whether it was his obligation to object to the State's newly suggested theory in closing argument, counsel admitted that "that thought occurred to me but I believed that by doing so, not only would I be ineffective as counsel, but probably commit malpractice because then I am instructing the prosecutor that he has another theory here on which he can prosecute my client."

¶ 70 These statements unequivocally confirm not only that D.B. had an opportunity to object to the State's accomplice liability theory during closing argument, but that he consciously opted not to do so for strategic reasons. The failure to object to the prosecution's accomplice theory was a calculated decision by a seasoned defense attorney. He was well aware of the risks presented by raising an objection to the accomplice theory

(of highlighting the theory and increasing the chance of it sticking) and of the potential upside to remaining silent (that the theory might go unnoticed and thus lead to an acquittal). Defense counsel gambled on the latter tack and lost. Such a conscious, strategic waiver removes any doubt about preservation. A passive failure to object may leave open questions about the opportunity and sufficiency of an objection; a strategic decision to forego an objection, on the other hand, results in an unmistakable waiver.[4]

¶ 71 The majority's grounds for rejecting these statements are unpersuasive. Unlike the majority, I see no reason to read into counsel's concessions a caveat—that he was speaking only of accomplice liability as to the theft charge and did not understand the discussion to relate to the trespass charge. *See supra* ¶ 31 & n. 11. The "colloquy" that led to counsel's concessions began with questions aimed at "references in the closing statement to the notion that [D.B.] was a lookout" and at the prosecutor's follow-up point that as a lookout D.B. "[was] just as responsible for what his co-defendant d[id] as if he committed the crime." In context, then, counsel's concessions came in a colloquy discussing evidence of certain and obvious relevance to the trespass charge. And of course it should be clear to us as it was clear to D.B.'s counsel in briefing on appeal that the only real doubt about accomplice liability in this case (if ever there was one) was on the trespass charge.

¶ 72 D.B.'s appellate brief opens with the request that we review the juvenile court's "finding D.B. guilty of criminal trespass, based upon accomplice liability, which was not alleged in the Petition, not argued by the State in the trial and not added to the Petition by amendment of the State at any time." Nowhere in the briefing does D.B. specifically question the sufficiency of his notice of the State's accomplice liability theory for the theft charge. So though the back-and-forth at oral argument may not have focused explicitly on accomplice liability *for trespass,* in context the discussion can only have been about that issue. The "lookout" testimony was of obvious reference to aiding and abetting the trespass, moreover, and counsel's concession is more than enough to nail down the failure to preserve the issues D.B. seeks to raise on appeal.[5] I would thus affirm the juvenile court's judgment on the ground that the arguments D.B. raises to challenge it were not only not preserved but affirmatively waived on strategic grounds.[6]

---

4. *See State v. King,* 2006 UT 3, ¶ 13, 131 P.3d 202 (holding that "under our preservation rule, defendants are ... not entitled to both the benefit of not objecting at trial and the benefit of objecting on appeal," and noting that the preservation requirement "inhibit[s] a defendant from forego[ing] ... an objection with the strategy of enhancing the defendant's chances of acquittal and then, if that strategy fails, ... claiming on appeal that the [c]ourt should reverse" (all but second alteration in original) (internal quotation marks omitted)).

5. I am likewise unpersuaded by the majority's insistence that defense counsel's supposed confusion or misunderstanding of the prosecutor's closing argument somehow excuses his failure to preserve the accomplice liability argument. *Supra* ¶ 31 & n. 11. Even assuming for argument's sake that D.B.'s counsel genuinely misunderstood the import of the prosecutor's closing statements, his subjective confusion cannot be enough to excuse his failure to preserve an objection. An objective standard is obviously the yardstick for assessing counsel's awareness of errors to preserve for appeal. Otherwise, trial counsel would be perversely incentivized to let their minds wander during trial, knowing that they could argue on appeal that they simply "didn't understand what counsel was trying to do" and that they did not receive adequate notice of the complained-of act. That is not and cannot be the law, and counsel's professed misunderstanding is accordingly insufficient in itself to excuse his failure to preserve. For reasons set forth in detail above, moreover, there was no objectively reasonable basis for any confusion on counsel's part, as there was much more than a "general hint" of accomplice liability in this case, *see supra* ¶ 31 n. 10.

6. In light of the ample grounds for finding that D.B. was aware of and waived any objection to the accomplice liability theory before entry of judgment, it is unnecessary to reach a final question resolved by the majority—that "D.B. did not need to file a postjudgment motion" to preserve his claims on appeal. *Supra* ¶ 36. Instead of opining on this matter, I would simply note (a) that I agree with the majority that the general rule disclaims a requirement of objecting to a final judgment, which is usually entered at a time when there is no longer an opportunity for any further objection; but (b) that it is not clear that the general rule would apply in this case, where the judgment was entered at a time and in cir-

## II

¶ 73 Assuming for the sake of argument that preservation problems would not preclude our reaching the merits, I would nonetheless affirm the juvenile court. I cannot sign on to the majority's conclusion that "D.B. did not receive constitutionally adequate notice of accomplice liability for criminal trespass prior to the close of evidence." *Supra* ¶ 41. Although I agree in large part with the majority's explication of the standard for constitutionally adequate notice under the Sixth Amendment, *see supra* ¶¶ 42–45, I disagree with the court's application of the standard and with the stark line the court draws in its opinion.

¶ 74 The majority correctly opines that "a defendant may receive constitutionally adequate notice that he is facing accomplice liability in several ways," including in a formal accomplice charge or "through presentation of adequate evidence at any time prior to the close of evidence at trial." *Supra* ¶ 45. In this case, as demonstrated above, there was more than ample evidence and argument during the course of trial to notify D.B. that he was on the hook as an accomplice. I would affirm the juvenile court on that basis if I were to reach the merits.

¶ 75 The majority cites a handful of cases that, in its view, correctly concluded that a defendant had received adequate notice of accomplice liability through some means other than overt charges or opening argument. *Supra* ¶ 45 (citing *State v. Mancine*, 124 N.J. 232, 590 A.2d 1107, 1120 (1991), *Commonwealth v. Smith*, 334 Pa.Super. 145, 482 A.2d 1124, 1127 (1984)). When closely examined, however, these cases actually support the conclusion that D.B.'s notice was sufficient.

¶ 76 First, as the majority notes, the defendant in *Mancine* "learned of the possibility of a hired-gunman theory through pretrial discovery .... [or] his own testimony." 590 A.2d at 1120. But instead of objecting to the State's proposal that the defendant be subject to accomplice liability, the *Mancine* court noted that he "made no claim of surprise or prejudice, he raised no objection at trial, he did not seek dismissal of the indictment before the trial, he did not object as the proofs unfolded, and he argued this point only in a motion for a new trial and on appeal." *Id.* at 1121. The *Mancine* court then opined that, "[i]n fact, in his closing argument, defense counsel emphasized that the State had two 'alternative' theories in an attempt to raise reasonable doubt in the minds of the jurors." *Id.* With all this in mind, the *Mancine* court concluded that the defendant "certainly had adequate notice to prepare a defense to both the accomplice-liability murder charge and its lesser-included aggravated manslaughter charge." *Id.*

¶ 77 Similarly, the *Smith* court reviewed the conviction of a defendant who had been found guilty of aggravated assault as an accomplice, though he had not been charged as such. 482 A.2d at 1127. The court affirmed the defendant's conviction, however, because he "was scheduled originally to be tried jointly with [a co-defendant]"[7] and because "[h]is criminal liability as an accomplice was advanced repeatedly during the trial in which he attempted to transfer criminal responsibility to [the co-defendant]." *Id.* The *Smith* court thus concluded that the defendant "was not prejudiced" by the State's failure to specifically charge the defendant as an accomplice and affirmed the conviction. *Id.*

cumstances in which D.B. did have an opportunity to object to the judgment (given that it was issued orally moments before D.B. was to be tried on the remaining counts of the petition against him, which had been bifurcated and continued from the initial trial).

These were unique circumstances. D.B.'s counsel was present when the ruling was handed down, as was the prosecutor. Before the trial commenced on the remaining charges, D.B.'s counsel asked the court for its disposition on the prior offenses. And after issuing its disposition on the first two counts, the juvenile court proceeded to work out sentencing options for D.B., before finally commencing the trial on the re-

maining charges. Once again, given the opportunity to object to the court's reliance on accomplice liability theory or to request a new trial while the issues were fresh in the court's mind and the parties were present, D.B.'s counsel remained silent. That silence seems damning in these circumstances, although I would stop short of a firm holding that an objection or motion was required as that conclusion is unnecessary to the result in this case.

7. The codefendant "was tried separately and was also found guilty of aggravated assault." *Commonwealth v. Smith*, 334 Pa.Super. 145, 482 A.2d 1124, 1126 n. 3 (1984).

¶ 78 These cases bear a striking resemblance to the one before us. As in *Mancine*, D.B.'s counsel undoubtedly would have been aware of the presence and actions of J.M. at the site. And as in *Smith*, D.B. had a coconspirator, J.M., who had already been adjudicated before testifying at D.B.'s trial. Throughout testimony and in argument, D.B.'s counsel sought to shift sole criminal liability away from his client and to J.M., just as in *Smith*. And like counsel in *Mancine*, D.B.'s counsel actually framed the issue of accomplice liability in his closing. Ultimately, D.B.'s counsel took the same course of inaction as counsel in *Mancine*—he "made no claim of surprise or prejudice, he raised no objection at trial, he did not seek dismissal of the indictment before the trial, he did not object as the proofs unfolded, and he argued this point only ... on appeal."[8] *Mancine*, 590 A.2d at 1121. Taken together, these events—and non-events—demonstrate that D.B. "certainly had adequate notice to prepare a defense to ... accomplice-liability." *Id.*

¶ 79 Even given all the circumstances listed above, the majority insists that D.B. was not given adequate notice of accomplice liability because "development of an accomplice liability theory after the close of evidence eliminates a defendant's ability to prepare his defense and present evidence relating to the accomplice liability theory." *Supra* ¶ 45 (emphasis omitted). Although I would conclude that there was plenty of evidence presented to give D.B. notice of accomplice liability theory, I would also draw the constitutional line somewhat differently.

¶ 80 I concede that in circumstances where the first and only inkling of any evidentiary basis for accomplice liability is in closing, pursuit of that theory would not likely satisfy the constitutional requirement of notice. That cannot mean, however, that there is a blanket rule against the prosecution raising accomplice liability explicitly for the first time in closing. If there is evidence plausibly supporting accomplice liability and the crime as charged can be read to encompass it, the prosecution is within its right to propose and urge a conviction on that basis—particularly in circumstances like this case where the *defense* goes out of its way in closing to suggest that possibility.

¶ 81 I see no basis in logic or the law to impose an outright bar on the prosecution's waiting until closing to first mention a theory of accomplice liability. In a case like this one, where the evidence presented is plausibly related to both principal and accomplice liability and the defense expressly opens the door to the latter, it seems eminently reasonable for the prosecution to press the theory openly for the first time in closing. In any event, however, that was not the first time the prosecution gave notice of this theory in this case, as the eyewitness and other testimony implicated D.B. as an accomplice. Thus, I would affirm D.B.'s conviction on the merits even if his counsel had preserved his claims for appeal.

---

8. Unlike counsel in *Mancine*, D.B. didn't even attempt to ask for a new trial, though the opportunity certainly presented itself. *See supra* ¶¶ 67–71.